**GOLDEN PACIFIC BANCORP, Plaintiff–Counter–Defendant–Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant–Counter–Claimant–Appellee.**

**Nos. 00–6208 L, 00–6258(CON).**

United States Court of Appeals, Second Circuit.

Argued Aug. 7, 2001.

Decided Dec. 7, 2001.

John G. Roberts, Jr., Hogan & Hartson L.L.P., Washington, DC, (Loraine F. Hebert; Paul A. Batista, New York, NY, on the brief), for Plaintiff–Counter–Defendant–Appellant.

J. Scott Watson, Federal Deposit Insurance Corporation, Washington, DC, (Ann S. DuRoss, Assistant General Counsel; Robert D. McGillicuddy, Supervisory Counsel; Alan L. Spear, Counsel, on the brief; Daniel J. Buzzetta, Thelen, Reid & Priest, LLP, New York, NY, on the brief), for Defendant–Counter–Claimant–Appellee.

Before MINER, CALABRESI, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

Plaintiff Golden Pacific Bancorp ("Bancorp" or "plaintiff") appeals from a judgment filed on June 16, 2000, by the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge* ), *Golden Pac. Bancorp ex rel. Golden Pac. Nat'l Bank v. FDIC,* No. 95 Civ. 9281, 2000 WL 776928, at *1 (S.D.N.Y. June 15, 2000), granting summary judgment to defendant Federal Deposit Insurance Corporation ("FDIC" or "defendant") on the grounds that plaintiff's claims brought in 1995 are barred by a release entered into between plaintiff and defendant, or alternatively, by New York's six-year statute of limitations for claims of unjust enrichment, breach of fiduciary duty, and corporate waste under N.Y. C.P.L.R. § 213(7). *Id.* at *4–6. On appeal, plaintiff asserts, *inter alia,* (1) that the release does not bar its claims because the language of the release does not cover them and (2) that the statute of limitations does not bar its claims because it runs from the termination of the receivership on November 1, 1995. For the reasons stated below, we vacate and remand the cause to the District Court for further proceedings consistent with this opinion.

**I.**

Bancorp owned more than 90% of the stock in Golden Pacific National Bank ("the Bank"), which was closed on June 21, 1985, by the Office of the Comptroller of the Currency ("the OCC") after the OCC had determined that the Bank was insolvent. The FDIC immediately placed the Bank into receivership and proceeded to pay the Bank's depositors. The FDIC also charged its legal and office expenses to the estate of the receivership. After it completed payment to the Bank's depositors, the FDIC paid itself post-insolvency interest to which it believed itself entitled,

with its first payment on March 15, 1991. The FDIC ended the receivership on November 1, 1995.

Substantial litigation between the present parties followed in the wake of the OCC's decision to close the bank. In September 1985, soon after the Bank was closed, the FDIC brought a civil action ("the September 1985 action") against a number of the Bank's officers seeking to recover $14 million in "assets from [those] who allegedly owe[d] funds to the Bank either as borrowers or guarantors." *FDIC v. Chuang*, 690 F.Supp. 192, 193 (S.D.N.Y. 1988). The defendants in that action counterclaimed for breach of fiduciary duty, misappropriation of funds, and loss of business opportunities in connection with some of the FDIC's actions as receiver. The FDIC brought a second action in 1985, seeking a declaratory judgment regarding the status of certain of the Bank's liabilities, in which it ultimately prevailed.

In addition, beginning in 1985, Bancorp twice tried unsuccessfully to sue the OCC, contending that the OCC had erroneously determined that the Bank was insolvent at the time of its closure. In these two related, successive actions, Bancorp's claims were held meritless under the Administrative Procedure Act and the Federal Tort Claims Act, *Golden Pac. Bancorp v. Clarke*, 837 F.2d 509 (D.C.Cir.1988), and

held not to constitute a taking under the Fifth Amendment, *Golden Pac. Bancorp v. United States*, 15 F.3d 1066 (Fed.Cir. 1994).

Then, in May 1986, Bancorp's former president and chief executive officer, Joseph Chuang, brought an action ("the May 1986 action") against the FDIC, among others, claiming that it had appropriated his law offices in connection with the seizure of the bank. As part of the combined settlement of the May 1986 action and the September 1985 action, the parties agreed to exchange certain releases.[1] Bancorp—although not a party to either action—executed a release on June 6, 1988 ("the release"), stating in relevant part:

> [Bancorp] ... hereby releases the [FDIC], in its corporate capacity and in its capacity as receiver of the [Bank] ... (c) from any and all claims which Bancorp ... has or may have arising from or with respect to the decision of the [OCC] to close the Bank on June 21, 1985.[2]

Bancorp commenced the instant action in the Southern District of New York on October 31, 1995, one day before the FDIC terminated the receivership. It asserted four claims: (1) that the FDIC was liable for unjust enrichment for paying itself post-insolvency interest; (2) that the FDIC breached its fiduciary duty to Ban-

1. In addition to the parties' exchange of releases, Bancorp agreed, *inter alia*, to pay the FDIC $14.6 million, while the FDIC agreed, *inter alia*, to transfer to Bancorp certain of the Bank's receivership assets.

2. The full text of the release is as follows:
   [Bancorp] hereby releases the [FDIC], in its corporate capacity and in its capacity as receiver of the [Bank], and the [Bank]: (a) from any and all claims which Bancorp (and/or any of its successors or assigns) has or may have relating to the assets and transactions which are the subject of the FDIC's claims set forth in its July 22, 1987

Amended Complaint in case no. 85 Civ. 7468 (S.D.N.Y.) (SWK); (b) from any and all claims which Bancorp (and/or any of its successors or assigns) has or may have arising from the transactions which are the subject of any counterclaims which any defendant has asserted against the FDIC or the Bank in case no. 85 Civ. 7468 (S.D.N.Y.) (SWK); and (c) from any and all claims which Bancorp (and/or any of its successors or assigns) has or may have arising from or with respect to the decision of the Comptroller of the Currency to close the Bank on June 21, 1985.

corp in its actions relating to the closure of the Bank, including its sale of certain Bank assets for an amount far below "true franchise value"; (3) that the FDIC wasted corporate assets of the Bank when it charged various legal and office expenses to the receivership estate for its own benefit; and (4) that the FDIC provided an inadequate accounting of the receivership estate. First Am. Compl., ¶¶ 72–99 (filed Mar. 4, 1996). In May 1996, the FDIC moved to dismiss the complaint for lack of subject matter jurisdiction, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2680(a), and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The District Court (Allen G. Schwartz, *Judge*) denied defendant's motion to dismiss the complaint for lack of subject matter jurisdiction, but referred to a magistrate judge the question of whether plaintiff's claims were time-barred.

On December 15, 1999, after the parties completed discovery, the FDIC filed a motion for summary judgment, arguing that Bancorp's action was barred by the release of June 6, 1988, and by the applicable statute of limitations. On June 16, 2000, the District Court (Naomi Reice Buchwald, *Judge*) concluded that plaintiff's claims were barred by the release or, in the alternative, by New York's six-year statute of limitations. *Golden Pac.*, 2000 WL 776928, at *4–6. Accordingly, it granted summary judgment for the FDIC.

■ Bancorp filed a notice of appeal of the District Court's judgment on June 29, 2000. On August 14, 2000, the Court granted Bancorp's summary judgment mo-

tion on the FDIC's previously unadjudicated counterclaim for attorney's fees to the FDIC. Then on September 1, 2000, Bancorp filed a second notice of its appeal from the June 16, 2000 judgment of the District Court.[3] On October 13, 2000, the FDIC filed its notice of cross-appeal from the August 14, 2000 order denying it attorney's fees. In an order filed December 19, 2000, we consolidated the appeals. On August 2, 2001, we granted the FDIC's motion to withdraw its cross-appeal for attorney's fees. Both parties' briefs assume that New York law controls.[4]

## II.

### A. STANDARD OF REVIEW

■ We review *de novo* a grant of summary judgment. *Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir.1996). Summary judgment is inappropriate unless the court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Catlin*, 93 F.3d at 1116. "The court must resolve all ambiguities and draw all inferences in favor of the non-moving party." *Id.*

■ A release is a species of contract and "is governed by principles of contract law." *Bank of Am. Nat'l Trust and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir.1985) (applying New York law). Whether a contract is ambiguous is a question for the court. *Van Wagner Adver. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 501 N.Y.S.2d 628, 631, 492 N.E.2d 756 (N.Y. 1986); *Fanger v. Manhattan Life Ins. Co.*, 273 A.D.2d 438, 709 N.Y.S.2d 622, 624 (2d

---

**3.** Because the FDIC had contended that Bancorp's June 29, 2000 notice of appeal from the June 16, 2000 judgment was premature, Bancorp, "as a precautionary measure," filed a notice of appeal from the District Court's August 14, 2000 order on September 1, 2000.

**4.** The parties' briefs assume that New York substantive law governs the issues of contract interpretation and statute of limitations presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000).

Dep't 2000). The interpretation of an unambiguous contract—including a release—is also a question of law reserved for the court. *See VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 129 (2d Cir.2001) (applying New York law). "Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact." *Gillaizeau,* 766 F.2d at 715 (applying New York law).

■ The application of the statute of limitations is an issue of law and is reviewed *de novo. See Kidder, Peabody & Co. v. Henehan,* 267 A.D.2d 120, 699 N.Y.S.2d 689, 690 (1st Dep't 1999) (noting "New York's rule that threshold Statute of Limitations questions are for the courts"); *Kronisch v. United States,* 150 F.3d 112, 120 (2d Cir.1998) (applying New York law).

## B. THE RELEASE

■ Under New York law, a release—like any contract—must be construed in accordance with the intent of the parties who executed it. *Stone v. Nat'l Bank & Trust Co.,* 188 A.D.2d 865, 591 N.Y.S.2d 609, 611 (3d Dep't 1992); *see Gross v. Sweet,* 49 N.Y.2d 102, 108, 424 N.Y.S.2d 365, 400 N.E.2d 306 (N.Y.1979) ("[A]n agreement [relieving] one party from the consequences of his negligence ... must evince the 'unmistakable intent of the parties.'"). A release will not be given effect unless it contains an "explicit, unequivocal statement of a present promise to release [a party] from liability." *Gillaizeau,* 766 F.2d at 713 (internal quotation marks omitted). Moreover, because the "law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing]," a release which purports to excuse a party from responsibility for misconduct is subject to the "closest of judicial scrutiny." *Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry,* 110 A.D.2d 343, 494

N.Y.S.2d 721, 723 (2d Dep't 1985) (citing *Gross,* 49 N.Y.2d at 106, 424 N.Y.S.2d 365, 400 N.E.2d 306). Applying the closest judicial scrutiny, we conclude that the District Court erred in granting summary judgment based on the release here.

Recall that the May 1988 release stated in relevant part:

> [Bancorp] ... hereby releases the [FDIC], in its corporate capacity and in its capacity as receiver of the [Bank] ... (c) from any and all claims which Bancorp ... has or may have arising from or with respect to the decision of the [OCC] to close the Bank on June 21, 1985.

The District Court found that the release was unambiguous and covered all of plaintiff's claims:

> We find the language of the June 1988 release to be unambiguous, and to encompass plaintiff's claims that the FDIC improperly managed the Bank's receivership. The text's specific reference to "the [FDIC] ... in its capacity as receiver of the [Bank]" clearly demonstrates the parties' intent to include the FDIC's handling of the receivership within the scope of the release. The claims at issue here, *i.e.,* the HKSB asset transfer, payment of FDIC office expenses and legal fees from the receivership estate, and payment of post-insolvency interest to creditors, are unambiguously claims that Bancorp "ha[d] or may have [had]" against FDIC–R as of June 1988 when the former released the lat[t]er. Bancorp's present attempt to argue that it had not intended to release defendant from the claims it now asserts simply cannot be reconciled with the unambiguous text of the release.

*Golden Pac.,* 2000 WL 776928, at *4 (alterations in original) (footnotes omitted).

We do not find the contractual language to be as clear as the District Court did. We recently recalled that "[t]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138–39 (2d Cir.2000) (internal quotation marks omitted) (applying New York law). Here, one could reasonably interpret the contract differently than the District Court did. The natural meaning of the contract was an agreement to release the FDIC from claims based on the OCC's decision to close the bank, not on claims of independent wrongdoing thereafter. The release specifies claims "arising from or with respect to *the decision of the [OCC] to close the Bank.*" (emphasis supplied). It is far from clear whether claims of wrongdoing by the FDIC in its management of the receivership of the bank "aris[e] from or with respect to the decision ... to close the Bank."

To be sure, the District Court held that because the receivership "was the direct result of the OCC's decision, [and] can be said to have arisen therefrom," the release includes claims based on the FDIC's mismanagement of the receivership. *Golden Pac.*, 2000 WL 776928, at *4 n. 6. But, in our view of the matter, the District Court's interpretation stretches the language "arising from" beyond its normal limits. Bancorp agreed to release claims "arising from ... the decision of the [OCC] to *close the Bank,*" (emphasis supplied), not from each and every event that followed thereafter. If one were to adopt the District Court's interpretation, then any act, no matter how far down the chain of causation and remotely related to the decision of the OCC to close the Bank, would fall within the scope of the release. This sort of causal reasoning would be analogous to finding that a patient, who signed a release with similar language to that in the instant case, had relinquished all claims relating to a second negligent operation performed to correct the negligence of the first operation, since the second operation "was the direct result of ... [and] can be said to have arisen" from the first. It is hard to believe that the parties intended the release to be so broad. Nor is it clear from the rest of the language of the release that their intention was so far-reaching. Had the parties intended the release to include claims based on the FDIC's management of the receivership, it would have been simple enough for them to adopt language that made clear their understanding.

We are not persuaded by the District Court's position that "[t]he text's specific reference to the [FDIC] ... in its capacity as receiver of the [Bank] clearly demonstrates the parties' intent to include the FDIC's handling of the receivership within the scope of the release." *Golden Pac.*, 2000 WL 776928, at *4 (second alteration in original) (internal quotation marks omitted). Even though the release refers to the FDIC's capacity as receiver, the release notably makes no mention of the FDIC's management of the receivership. One could reasonably conclude that the release mentioned the FDIC in its capacity as receiver not to foreclose all possible claims by Bancorp against the FDIC as receiver, but rather because that was the capacity in which the FDIC brought suit in the September 1985 action and was sued in the May 1986 action. Indeed, the release specifically refers to the claims and counterclaims in the September 1985 action. In any case, the contract wording requires us to conclude that the release did not unambiguously relinquish Bancorp's claims against the FDIC for its alleged mismanagement of the Bank.

Where an agreement is ambiguous, a court may resort to extrinsic evidence to determine the parties' intent. *Stage Club Corp. v. W. Realty Co.*, 212 A.D.2d 458, 622 N.Y.S.2d 948, 950–51 (1st Dep't 1995). The parol evidence rule will not bar admission of evidence that clarifies the ambiguity, so long as the evidence is not inconsistent with the express terms of the contract. *Id.* There is ample extrinsic evidence in the instant case supporting Bancorp's argument that it did not intend to release the FDIC from all claims of wrongdoing relating to the receivership. Bancorp presented affidavits from two witnesses to the negotiation and execution of the release (Joseph Chuang, who signed the release, and Thomas A. Brooks, then-counsel to Bancorp). Chuang testified in his affidavit that when he executed the release he "had no intention ... of releasing the FDIC from any claims stemming from its role" in managing the receivership. (Chuang Aff. ¶ 46). Moreover, Brooks attested to Bancorp's rejection of an earlier draft release proposed by the FDIC. (Brooks Aff. ¶¶ 7–8.) That draft release was far broader in scope than the release ultimately executed. It provided in relevant part:

> [Bancorp] hereby releases the [FDIC] ... from any and all disputes and claims with and against the FDIC and/or the Bank which Bancorp and/or any of Bancorp's successors or assigns now has, ever had, or which may hereafter accrue, based on acts, omissions or transactions occurring prior to ... 1988. Without limiting the foregoing ... Bancorp releases the FDIC and the Bank from any dispute or claim arising from or in respect of the closing of the Bank or *any act taken by, or omission of, the FDIC as receiver of the Bank.*

(emphasis supplied). That language—expressly rejected by Bancorp—would have barred Bancorp's claims here, which indeed arise from "act[s] taken by ... the FDIC as receiver of the Bank." That Bancorp rejected draft contract language which explicitly released the FDIC from any act taken or omitted as receiver of the Bank strongly suggests that Bancorp did not intend to relinquish such claims in the final release.

The District Court, in an alternative holding, concluded that, even if the release were to be considered ambiguous, necessitating an examination of extrinsic evidence, Bancorp's proffered parol evidence would not have altered its decision that the release barred Bancorp's claims. *Golden Pac.*, 2000 WL 776928, at *4 n. 7. First, the District Court discounted Brooks' statement made in 1988 that "Bancorp should not execute a release as it was not a party to the [September 1985 action] brought by FDIC." *Id.* The District Court found that this statement alone was "unavailing" because, in any event, "Bancorp ultimately executed the release." *Id.* Second, the District Court gave no weight to Brooks' statement that "he had rejected an earlier draft of the release." *Id.* It concluded, "[h]aving reviewed both versions[,] ... that the earlier version differs from the one ultimately signed, but [it was] unable to infer from the change that the parties intended to exclude plaintiff's claims against the receiver from the release's ambit." *Id.*

We disagree with the District Court's conclusions. To be sure, Brooks' statement that he had advised Bancorp not to execute *any* release does not help one interpret the scope of the release actually executed. Still, the District Court did not give due weight to the Chuang Affidavit, which bears directly on Bancorp's intention in signing the release. Nor did it give adequate consideration to Brooks' statement describing rejection of the first draft release. Moreover, the Court failed to

give sufficient weight to the presence in the first draft release of a provision expressly releasing the FDIC from any act or omission taken as receiver and the absence of any such clause in the final, executed release. Taken together, the evidence from Chuang's Affidavit, Brooks' statement describing the rejection of the first draft release, and the first draft release itself, raises a genuine issue of material fact as to the parties' intentions in executing the final release. Accordingly, the release should not have been the basis for summary judgment in favor of the FDIC. *See Mangini v. McClurg*, 24 N.Y.2d 556, 568, 301 N.Y.S.2d 508, 249 N.E.2d 386 (N.Y.1969) (holding that summary judgment based on release should not have been granted because "the affidavits and pretrial testimony presented on this motion for summary judgment fail to demonstrate conclusively that no issue of fact remains as to the intent of the parties"); *Scott v. Niagara Scuba Sports, Inc.*, 155 A.D.2d 864, 547 N.Y.S.2d 475, 476 (4th Dep't 1989) (holding that the "Supreme Court erred in granting defendants' summary judgment motion and dismissing plaintiff's claims" where "[t]he release that decedent signed . . . and upon which [the] Supreme Court relied is ambiguous and does not express in unmistakable language the intention of the parties"); *see also* Fed.R.Civ.P. 56(c).

## C. The Statute of Limitations

■ The statute of limitations in New York for claims of unjust enrichment, breach of fiduciary duty, corporate waste,

and for an accounting is generally six years. *See* N.Y. C.P.L.R. §§ 213(1), (7) (McKinney 1990)[5]; *see also Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 519 N.Y.S.2d 801, 803, 514 N.E.2d 113 (N.Y. 1987) (unjust enrichment as a result of breach of fiduciary obligation); *Niagara Mohawk Power Corp. v. Freed*, 265 A.D.2d 938, 696 N.Y.S.2d 600, 603 (4th Dep't 1999) (unjust enrichment and breach of fiduciary duty); *Blake v. Blake*, 225 A.D.2d 337, 638 N.Y.S.2d 632, 632 (1st Dep't 1996) (corporate waste and breach of fiduciary duty); *In re Barabash's Estate*, 31 N.Y.2d 76, 80, 334 N.Y.S.2d 890, 286 N.E.2d 268 (N.Y. 1972) (accounting).

■ The FDIC argues that the statute of limitations runs upon the occurrence of the events underlying the plaintiff's cause of action. In the instant case, the FDIC maintains that the events underlying the plaintiff's claims arose in June 1985, when the FDIC began to liquidate the Bank. Accordingly, the FDIC concludes that the plaintiff's claims should be time-barred because it filed its lawsuit more than six years after June 1985.

■ Under New York law, the limitations period for claims arising out of a fiduciary relationship does not commence "until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated." *Westchester Religious Inst. v. Kamerman*, 262 A.D.2d 131, 691 N.Y.S.2d 502, 503 (1st Dep't 1999); *accord 196 Owners Corp. v. Hampton Mgmt. Co.*, 227 A.D.2d 296, 642

---

**5.** N.Y. C.P.L.R. § 213 (McKinney 1990) provides in relevant part:

The following actions must be commenced within six years:
1. an action for which no limitation is specifically prescribed by law;
. . .
7. an action by or on behalf of a corporation against a present or former director,

officer or stockholder for an accounting, or to procure a judgment on the ground of fraud, or to enforce a liability, penalty or forfeiture, or to recover damages for *waste* or for an *injury to property* or for an *accounting* in conjunction therewith.
(emphases supplied).

N.Y.S.2d 316, 316 (1st Dep't 1996); *Bd. of Educ. v. Thompson Const. Corp.*, 111 A.D.2d 497, 488 N.Y.S.2d 880, 882 (3 Dep't 1985). In such cases, the "statutory period [is] tolled between the alleged fiduciary misconduct" and the date on which the fiduciary relationship is openly repudiated or otherwise ended, so that any misconduct alleged before that end date "falls within the permissible temporal scope." *Kamerman*, 691 N.Y.S.2d at 503. A receivership is, of course, a type of fiduciary relationship and is therefore subject to this tolling period. *See, e.g., Kupferman v. Consol. Research & Mfg. Corp.*, 459 F.2d 1072, 1080 (2d Cir.1972) (Friendly, J.) (applying New York law) ("[A] receiver is a trustee with the highest kind of fiduciary obligations ... to all persons interested in the receivership estate.") (internal quotation marks omitted).

The reason for such a tolling rule is that the beneficiary should be entitled to rely upon a fiduciary's skill without the necessity of interrupting a continuous relationship of trust and confidence by instituting suit. *See Greene v. Greene*, 56 N.Y.2d 86, 92, 94–95, 451 N.Y.S.2d 46, 436 N.E.2d 496 (N.Y.1982) (describing the relationship between an attorney and his client as a fiduciary one and then noting that "the client [cannot] be expected ... to oversee or supervise the attorney's handling of the matter, and thus ... the client's right of action [did not] accrue[ ] before he terminated [his] relationship with [his] attorney"); *see also Barrella v. Richmond Mem'l Hosp.*, 88 A.D.2d 379, 453 N.Y.S.2d 444, 447 (2d Dep't 1982)

In this case, it is undisputed that Bancorp and the FDIC had a fiduciary relationship,[6] and that the FDIC did not terminate its fiduciary relationship with Bancorp—that is, its receivership of the Bank—until November 1, 1995. Accordingly, the statute of limitations on Bancorp's claims did not begin to run until that date. *See Kamerman*, 691 N.Y.S.2d at 503 (holding that a nonprofit corporation's officers could not be said to have openly repudiated their fiduciary obligations prior to leaving their positions of trust). Bancorp's lawsuit—filed on October 31, 1995—is thus timely under the six-year statute of limitations that began on November 1, 1995, when the fiduciary relationship ended.

Bancorp's unjust enrichment claim is timely for an additional reason. Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff. *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir.1986) (applying New York law); *see State v. Barclays Bank*, 76 N.Y.2d 533, 561 N.Y.S.2d 697, 701, 563 N.E.2d 11 (N.Y.1990). The statute of limitations for unjust enrichment generally begins to run when the cause of action accrues. N.Y. C.P.L.R. § 203(a); *Plitman v. Leibowitz*, 990 F.Supp. 336, 337 (S.D.N.Y.1998) ("Under New York law, an unjust enrichment claim accrues upon occurrence of the wrongful act giving rise to the duty of restitution."). The District Court held that the cause of action accrued on Bancorp's claims when the FDIC "began to perform the acts upon which the claims are based," *Golden Pac.* 2000 WL 776928, at *5; that is, the Court calculated the starting date for the six-year statute of

---

**6.** Bancorp argues that they had a fiduciary relationship, and the FDIC does not deny that assertion.

limitations to be in or about 1985, when the FDIC began to accrue post-insolvency interest, and concluded that Bancorp had filed its claims too late.

■ The District Court improperly conflated the accrual of the cause of action with the accrual of post-insolvency interest. The statute of limitations for a claim of unjust enrichment begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution." *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 192 A.D.2d 501, 596 N.Y.S.2d 435, 437 (2d Dep't 1993). The wrongful act giving rise to restitution here was the FDIC's *payment of interest* to itself. The mere *accrual of interest*, in the instant case, does not unjustly enrich the FDIC nor does it *accrue the cause of action.* Rather, the accrual of interest simply designates a starting point for calculation. The cause of action did not accrue or become more than speculative until the FDIC began to pay itself interest on March 15, 1991. Indeed, before that point, the FDIC had neither been enriched nor possessed any of Bancorp's "money or property" that "equity and good conscience" would require it to return. Accordingly, Bancorp's claim for unjust enrichment brought before March 15, 1997 was timely.

### III.

To summarize:

1. It is unclear whether the release covers plaintiff's claims against the FDIC for unjust enrichment, breach of fiduciary duty, waste of corporate assets, and an accounting in the management of the receivership. The extrinsic evidence, when viewed in the light most favorable to the plaintiff, is ambiguous and creates a genuine issue of material fact as to whether Bancorp intended to release the FDIC.

2. The statute of limitations does not bar Bancorp's claims as a matter of law because the limitation period did not begin to run until the receivership terminated.

For the reasons stated above, we vacate the June 16, 2000 judgment of the District Court and remand the cause to the Court for further proceedings consistent with this opinion.