**ECLAIRE ADVISOR LTD. AS TRUSTEE TO DAEWOO INTERNATIONAL (AMERICA) CORP. CREDITOR TRUST, Plaintiff,**

v.

**DAEWOO ENGINEERING & CONSTRUCTION CO., LTD., Defendant.**

**No. 04 Civ. 8876(JSR).**

United States District Court, S.D. New York.

June 15, 2005.

---

**260**

Carolyn Traister Schiff, Robert A. Weiner, McDermott, Will & Emery, L.L.P., New York, NY, for Plaintiff.

James L. Bromley, Cleary Gottlieb Steen & Hamilton, LLP, New York, NY, Steven Michael Hecht, Lowenstein Sandler PC, Roseland, NJ, for Defendant.

### MEMORANDUM

RAKOFF, District Judge.

Plaintiff Eclaire Advisor Ltd. ("Eclaire") is Trustee for the Daweoo International (America) Corporation Creditor Trust (the "Creditor Trust"), which was established on March 13, 2002, by order of the Bankruptcy Court for the Southern District of New York, for the purpose of collecting and distributing certain assets of Daweoo International (America) Corporation ("DWA") to its creditors. Eclaire brings this action against defendant Daewoo Engineering & Construction Co., Ltd. ("DWEC") to recover approximately half a billion dollars worth of unpaid loans extended by DWA to Daewoo Corporation ("DWC"). Plaintiff alleges six causes of action: successor liability (Counts 1 and 2), unjust enrichment (Count 3), fraudulent conveyance pursuant to Section 276 of the New York Debtor and Creditor Law (Count 4), fraudulent conveyance pursuant to Section 274 of the New York Debtor and Creditor Law (Count 5), and fraudulent conveyance pursuant to Section 273 of the New York Debtor and Creditor Law (Count 6). *See* Am. Compl. ¶¶ 70–112.

Shortly after this lawsuit was commenced, defendant moved to dismiss the Complaint based on (1) lack of personal jurisdiction, (2) lack of subject matter jurisdiction, (3) *forum non conveniens,* (4) international comity, (5) *res judicata,* (6) failure to state a claim under Korean law, and (7) failure to state a claim under New York law. On February 10, 2005, the Court held argument on these motions, during which it became apparent that further discovery and additional briefing would be required with respect to the issue of personal jurisdiction. *See* transcript, February 10, 2005. Following such discovery and further briefing, the Court, on May 20, 2005, denied defendant's motion in its entirety. *See* Order dated May 20, 2005. This Memorandum will set forth the reasons for that ruling.

While the aspects of the motion directed at alleged failures to state a claim must be

decided on the pleadings, the Court may, and has, considered facts outside the pleadings as to the other aspects. The relevant facts are as follows:

DWA, a New York corporation with its principal place of business in Ridgefield Park, New Jersey, was (prior to bankruptcy) the American trading arm and a wholly-owned subsidiary of DWC, one of the companies comprising the Daewoo Group, which itself is one of Korea's largest industrial conglomerates. *See* Corrected Amended Complaint ("Am.Compl.") ¶¶ 1–2, 43. Between 1998 and 1999, DWA made approximately fifty-nine separate loans totaling $533,817,368.06 to DWC, which at the time was facing severe financial difficulties in connection with the Asian financial crisis. *See id.* ¶¶ 46–47 & Ex. A. Each loan was to be repaid within one year of its disbursement. *See id.* ¶ 50 & Ex. A.

In August 1999, it became apparent that DWC would not be able to make good on its loan commitments to DWA and other lenders. DWC and its affiliates, therefore, sought relief from the lenders through a "workout." *See id.* ¶ 51. DWC's subsequent failure to repay any of these loans in turn caused DWA to be faced with its own financial difficulties. *See id.* ¶ 55; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Mem.") at 3. Soon thereafter, on March 17, 2000, DWA filed for Chapter 11 bankruptcy. *See In re Daewoo International (America) Corp.*, No. 00–11050 (Bankr. S.D.N.Y.).

In July 2000, as part of a Workout Agreement entered into by DWC and its affiliates on March 15, 2000, *see* Exhibit E at 58 (Workout Agreement) attached to Affidavit of Jin Yeong Chung, December 22, 2004 ("Chung Aff."), the shareholders of DWC ratified a proposal to spin-off DWC's assets (the "Spin–Off"), pursuant to certain provisions of Korean Law (the "Commercial Act"), *see* Pl. Mem. at 3; Debtor's Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for its Amended Plan of Reorganization ("Disclosure Statement") at 16, attached as Exhibit 11 to Declaration of James L. Bromley, December 23, 2004 ("Bromley Decl."). The Spin–Off resulted in DWC being split into two separate, newly formed companies, namely, (1) Daewoo International Corporation ("DWIC"), which took over certain assets and related liabilities of DWC's trading operations, and (2) Daewoo Engineering & Construction Co., Ltd. ("DWEC"), which took over certain assets and related liabilities of DWC's construction and engineering operations and businesses. *See id.;* Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def.Mem.") at 4; Am. Compl. ¶¶ 59–62. As a result, DWC was no longer able to satisfy its financial obligations to DWA, and, DWA, in turn, was unable to satisfy the claims of its creditors. *See* Am. Compl. ¶¶ 53–62.

On July 24, 2000, in accordance with the Commercial Act, DWC sent written notice of the approval of the Spin–Off, and gave its creditors until August 24, 2000 to object to the Spin–Off. *See* Notice to Creditors of Daewoo Corporation, July 24, 2000, attached as Exhibit 2 to Bromley Decl.; Commercial Act Arts. 232 & 527–5, attached as Exhibit D to Chung Decl. On August 23, 2000, DWA timely objected to the Spin–Off, pursuant to the Commercial Act. *See* Letter of Scott E. Ratner, Esq., August 23, 2000, attached as Exhibit 3 to Bromley Decl.; Disclosure Statement at 22. Nonetheless, the Spin–Off went forward on December 27, 2000, leaving DWA's objection unresolved. *See* Disclosure Statement at 22

The Commercial Act provides that parties who timely file objections to a Spin–Off but whose objections are not resolved

prior to the effective date of the Spin–Off may bring legal action to nullify the Spin–Off within six months of such date, here by June 27, 2001. *See* Commercial Act Arts. 529–2. Accordingly, in early March 2001, two trade creditors of the Creditors Committee from the DWA bankruptcy filed a lawsuit on behalf of DWA seeking an equitable order nullifying the Spin–Off on the ground that it had been completed in violation of Korean law (the "Objection Litigation"). *See* Complaint in Objection Litigation, attached as Exhibit 6 to Bromley Decl ("Complaint in Objection Litigation") at 3–4. In addition, they applied to the U.S. Bankruptcy Court for permission to commence adversary proceedings in the United States against future Trust beneficiaries. *See* Def. Mem. at 7.

On March 20, 2001, after the commencement of the Korean litigation but before the Bankruptcy Court could rule on the aforesaid application, all legal challenges were resolved by stipulation (the "Spin–Off Settlement"). *See* Order Approving Stipulation By and Among Debtor, Official Committee of Unsecured Creditors, Daewoo International Corporation, Korean Asset Management Corporation and Korea Exchange Bank Regarding Plan Term Sheet, Plan Funding, and Exclusivity and Among Claims Issues, March 20, 2001 (Spin–Off Settlement), attached as Exhibit H to Affidavit of Robert A. Weiner, January 21, 2005 ("Weiner Aff."). Among other things, the Spin–Off Settlement provided that the parties would submit a Plan of Reorganization, pursuant to which (a) DWA's claims to trade creditors would be substantially paid and (b) a Creditor Trust would be created to pursue and collect

assets to satisfy the claims of DWA's other creditors. The Spin–Off Settlement contained a release (the "Limited Release") of many of the claims asserted against DWC, DWEC and DWIC. In particular, the Limited Release not only provided that Creditors Committee would withdraw its objection to the Spin–Off and dismiss the entire Korean Litigation with prejudice, but also permitted one, specific carve-out, *viz.*, the ability to collect monetary claims from DWC, DWEC, and DWIC:

> [DWA, the Creditors Committee and each holder of an Unsecured Trade Claim] will release and waive all claims and causes of action relating to, or arising from, the restructuring and Spin–Off ... provided, however, that such release and waiver will not extend to or cover collection claims, whether asserted under U.S. law or Korean law, that DWA has or may have against [DWC], DWIC or DWEC for monetary obligations that are due and owing ....

> In addition, upon entry of an Order by the Court approving the Stipulation incorporating this Term Sheet and the funding of the Unsecured Trade Creditors Escrow Account, the Creditors Committee shall withdraw its objection to the listing of the stock of [DWC], DWIC and DWEC and discontinue its prosecution and dismiss with prejudice all litigation filed in Korea by the Creditors Committee against [DWC], DWIC, and DWEC. Not withstanding the foregoing, DWA's objections to the Spin–Off shall not be withdrawn.

Spin–Off Settlement at 17–18.[1] Thereafter, plaintiff then withdrew its lawsuit in

---

1. At March 21, 2001 hearing before the Bankruptcy Court on debtor's counsel also stated: One aspect of this [settlement] stipulation is that those receivables [i.e., the Loans] are not being forgiven, they are not being cancelled, no releases are to be given on them;

they will survive and they will be actively prosecuted.... [T]hese claims ... are not things that are going to be swept under a carpet, they are going to be actively pursued. But the question is all about timing. Everyone believes

Korea with prejudice, stating in its withdrawal papers, that DWA would not file "any lawsuit related to the Nullification of Spin–Off again." Weiner Aff. at Ex. J.

In February 2002, the Bankruptcy Court confirmed DWA's Plan of Reorganization. *See* Confirmation Order, attached as Exhibit L to Weiner Aff. On March 22, 2002, as required by the Plan and the Confirmation Order, DWA entered into a "Creditor Trust Agreement" that, *inter alia,* created the Creditor Trust. *See* Lee Aff. Ex. B, § 1.1. The net effect of the creation of the Trust was that DWA transferred title and interest in its assets to the Creditor Trust in order to liquidate the assets of DWA. *See* Bromley Decl. Ex. 12 (DWA Plan), at 29 & Ex. 13 (Conf.Order) ¶ 18. This suit by the trustee, Eclaire, to collect on the still unpaid loans followed.

Against this background, the Court considers each of the seven grounds of defendant's motion to dismiss:

■ 1. *Personal Jurisdiction.* Defendant DWEC first argues that the Court lacks personal jurisdiction over it. In response, Eclaire argues that this Court has personal jurisdiction because DWEC's New York-based subsidiary, Daewoo America Development, Inc. ("DADI"), is doing business in New York and DWEC controls and runs DADI as if it were a mere department of DWEC and/or because DADI is serving as DWEC's New York agent. *See* Plaintiff's Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction, April 8, 2005, at 1, 30.

■ As to the first alternative, under New York law, which governs this issue, the determination whether a subsidiary is

a "mere department" of the parent requires examination of four factors. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120–122 (2d Cir.1984):

> The essential factor is common ownership. . . . The second factor is financial dependency of the subsidiary on the parent corporation. . . . The third factor is the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities. . . . The fourth factor is the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.

*Id.*

The first factor is clearly met, as DADI is a 100%-owned subsidiary of DWEC, with its principal place of business in New York City. *See* deposition of Chang–Mo Lee, March 10, 2005 ("C.M. Lee Dep."), at 26:4–27:7, 29:17–30:10, 82:14–16, attached as Exhibit 3 to Affidavit of B. Ted Howes, April 8, 2005; *see also Beech Aircraft Corp.,* 751 F.2d at 120 (common ownership shown where subsidiary is wholly-owned by parent).

The second factor is also met, as shown by the fact that DADI must obtain DWEC's pre-approval for any expenditures, other than "minor additional expenses" (such as transportation, supplies, and the like), over its DWEC-approved annual budget. *See, e.g.,* email from Sung Kyu Hong to Young Son Park, July 22, 2004, attached as Exhibit 24 to Howes Aff; *see also, e.g., Dubied Machinery Co. v. Vermont Knitting Co.,* 85 Civ. 8610, 1992 WL 142044, *3–4, 1992 U.S. Dist. LEXIS

---

they are worth more than now. So this stuff would be collected post-confirmation by the Trustee under the Trust to be formed by the Plan.

Weiner Aff., Ex. I at 22–23.

8442, at *11–*12 (S.D.N.Y. June 11, 1992) (parent's review and control of subsidiary budget sufficient to establish financial dependency). Furthermore, DADI's most recent audited financial statement, for 2002, states that DADI "is dependent on its parent and affiliated companies for funding to support operations and satisfy its obligations." Consolidated Financial Statements for December 31, 2002 and 2001 for Daewoo America Development, Inc. and Subsidiaries at DADI/DADNY 4727, attached as Exhibit 25 to Howes Aff.

As to the third factor, Eclaire has demonstrated that DWEC in effect dictates the selection of DADI's executive personnel. Indeed, since DADI became a subsidiary of DWEC, it appears that every officer and director of DADI (and each of DADI's own subsidiaries) has been an officer, current or former, of DWEC. *See* "Common Officers of DWEC and DADI" Summary ("Common Officers Summary"), attached as Exhibit 18 to Howes Aff.; C.M. Lee Dep. at 88:14–90:22. Additionally, every President of DADI, past or president, has served concurrently as the Executive Managing Director of DWEC's Investment Division. *See id.;* Bak Dep. at 82:18–25; *Ugalde v. Dyncorp, Inc.,* 98 Civ. 5459, 2000 WL 217502, *3, 2000 U.S. Dist. Lexis 1745, at *10 (S.D.N.Y. Feb. 21, 2000) (parent exerting significant control over the selection of the subsidiary's executive personnel sufficient to demonstrate a lack of corporate formality); *Public Adm'r of New York County v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 381–82, 224 N.E.2d 877 (N.Y.1967) (staff of subsidiary assigned and moved among subsidiaries by parent sufficient to demonstrate a lack of corporate formality).

Finally, the fourth factor is also met, as shown by the fact that DADI has only three full-time employees, *see* Common Officers Summary, and one of those employees, Mr. Sun–Gu Kim, who serves as the President of DADI and each of DADI's subsidiaries, neither lives nor works in the United States, *see* Deposition of S.G. Kim, March 11, 2005 ("Kim Dep.") attached as Exhibit 4 to Howes Aff. at 83:17–85:2. In addition, the functional role of Mr. Kim as President of DADI, at present, is open to question. *Compare, e.g.,* Kim Dep. at 27–28, 30, 39–40 (President of DADI a figurehead) *with, e.g.,* C.M. Lee Dep. at 46, 76, 126 (President of DADI routinely consulted and issued approvals). Further still, there is evidence that DADI routinely sought the approval of DWEC regarding DADI's operational and financial decisions. *See* Deposition of S.H. Bak, March 21, 2005 ("Bak Dep."), at 130, attached as Exhibit 2 to Howes Aff.

■ Independently of all this, the Court also has personal jurisdiction over DWEC because DADI acts as DWEC's New York agent. DADI clearly does business in New York, as it provides services beyond "mere solicitation." For example, it is the corporate mechanism through which DWEC invests in New York real estate opportunities such as the Claton Park project in White Plains and the 415 Greenwich project in Tribeca. *See* deposition of Joon–Ha Lee, March 16, 2005, at 152–68; C.M. Lee Dep. at 164:6–175:19.; *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000). In addition, DADI is primarily employed by DWEC and is not engaged in similar services for other clients. *See Wiwa,* 226 F.3d at 95.

■ **2. Subject Matter Jurisdiction.** Eclaire asserts that this Court has subject matter jurisdiction based on diversity of citizenship, since Eclaire is a New Jersey corporation and DWEC is a Korean corporation. *See* Am. Compl. ¶ 1; Def. Mem. at 2; Pl. Mem. at 3. In response, DWEC contends that the diversity is illusory, be-

cause Eclaire is a "naked trustee with only limited authority whose citizenship should not be considered for purposes of diversity." Def. Rep. at 24 (internal quotations omitted). However, in *Navarro v. Lee*, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), the Supreme Court held that a "trustee is a real party to the controversy for purposes of diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others." *Id.* at 464. Eclaire possesses the customary powers of a true trustee. It was established for the purpose of liquidating the assets of DWA for distribution to the creditors; it has sole and exclusive title to all the assets of the Creditor Trust (including the loans at issue here); and it has "exclusive power" to prosecute lawsuits to collect such assets. *See* Affidavit of Paul Lee, January 20, 1995, ¶¶ 9, 10, 23 & Ex. B (Creditor Trust Agreement).

**3. *Forum Non Conveniens.*** In a case involving international parties, plaintiff's choice of forum is generally given great deference when plaintiff has brought suit in its home country. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir.2001) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56, 256 n. 23, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)). Assuming, however, that Korea is an adequate alternative forum, this Court must also assess the private and public interests set forth in *Gulf Oil v. Gilbert*, 330 U.S. 501, 507–12, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

The public *Gilbert* factors weigh in favor of retaining jurisdiction. Among other things, the United States clearly has an interest in this dispute as it involves a U.S. trustee acting on behalf of a U.S. creditor trust created by a U.S. court seeking to recover unpaid U.S. loans. Furthermore, every indication is that the case will go forward with greater expedition in this Court than in the courts of Korea. While the fact that the law of Korea may be involved is a complicating factor, it does not appear that such issues of Korean law as are likely to arise are very difficult. Besides, the courts of this District are very well experienced in the determination and application of foreign laws, since so much of the commercial activity of this District involves foreign commerce.

The private *Gilbert* factors also tilt in favor of plaintiff. In this day and age of rapid transportation and instant communications, the convenience of immediate physical proximity to documents, testimony, and other proof has become of less consequence to a *forum non conveniens* analysis, especially when, as here, two large and sophisticated parties are involved. *See Calavo Growers of Cal. v. Generali Belgium*, 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring) ("It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communications have significantly altered the meanings of '*non conveniens*' "), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981). The lack of compulsory process to obtain the attendance of witnesses is likewise of little consequence in this case, since plaintiff does not anticipate any third-party discovery. *See* Pl. Mem. at 29. In short, neither the public nor the private factors warrants disturbing plaintiff's choice of forum.

**4. *International Comity.*** DWEC contends that adjudicating this controversy in this Court will run afoul of international comity, since DWA withdrew its Korean litigation, permitting a large corporate restructuring to go forward in Korea. Def. Mem. at 22. But the instant

dispute does not implicate genuine issues of international comity at all. The case does not threaten any executive, legislative, or judicial act of Korea. *See* Def. Mem. at 24 (essentially conceding as much). The Spin–Off was basically a private, contractual arrangement in all material respects. *See Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 130 (E.D.N.Y. 2000). By contrast, the instant suit at least involves a modicum of U.S. national interest, in that the plaintiff represents a court-created trust.

**5. *Res Judicata.*** Defendant argues that the instant action is barred under the doctrine of *res judicata.* This, defendant says, follows from the facts that (a) plaintiff here is in privity with DWA, (b) DWA made the claims here the premise of its Objection Litigation in Korea, which it then dismissed with prejudice, and (c) whatever carve-out remained to pursue these claims was subsequently released or waived.

Even as to the claim of privity, the argument is flawed. The actual plaintiffs in the Objection litigation were LDM Technology Inc. ("LDM") and Delphi Automotive Systems Corp. ("Delphi") two unsecured trade creditors of the Creditors Committee. *See* Complaint in Objection Litigation at 3–4. Here, the plaintiff, Eclaire, ultimately represents the interests of the non-trade creditors of DWA. *See supra.* Hence, at a minimum, an unresolved question of fact exists as to whether the parties at interest in the Objection Litigation are "virtually identical" to, and therefore in privity with, the parties at interest in this law suit. *See Chase Manhattan Bank, N.A. v. Celotex Corp.,* 56 F.3d 343, 345–46 (2d Cir.1995); *see also Cowan v. Ernest Codelia, P.C.,* 149 F.Supp.2d 67, 77 (S.D.N.Y.2001) ("In determining whether parties have an identity of interests New York courts permit flexible consideration of whether all of the facts and circumstances of the party's and nonparty's actual relationship, their mutuality of interests and the manner in which the nonparty's interests were represented in the previously decided litigation establishes a functional representation such that the nonparty may be thought to have had a vicarious day in court." (quotation and citation omitted)).

 But even assuming, *arguendo,* that privity exists, there was no release or waiver. Under New York law a party claiming to be released from liability bears a heavy burden of proving that the alleged release contains an "explicit, unequivocal statement of a present promise to release [a party] from liability." *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 515 (2d Cir.2001). The release provision must be shown to reveal an "unmistakable intent of the parties." *Id.* Moreover, "[c]laim preclusion will not apply ... if the parties intended to settle only one part of a single claim and intended to leave another part open for future litigation." *United States v. Valores Corporativos, S.A.,* 159 B.R. 689, 690 (S.D.N.Y.1993); *see also* Restatement (Second) of Judgments § 26 (cmt (a)) (same).

 Here, as previously noted, the release entered into in connection with the settlement of the Objection Litigation contained an express carve-out for "collection claims, whether asserted under U.S. law or Korean law, that DWA has due or may have against Daewoo Corporation, DWIC or DWEC for monetary obligations that are due and owing." Spin–Off Settlement at 18. This was reaffirmed at the bankruptcy confirmation hearing, where counsel represented that "[o]ne aspect of this stipulation is that those receivables are not being forgiven, they are not being canceled, no releases are to be given on them; they will survive and they will be actively

prosecuted." *See* transcript, Bankr. S.D.N.Y., March 20, 2001, at 22–23. That this was a reference to, among other things, the loans here at issue is shown by the subsequent Confirmation Order contained itself, which contained a specific carve-out for these claims:

> the Debtor, the Creditors' Committee and all holders of Class 5 Claims receiving a Distribution under the Plan on account of an Allowed Claim, shall release and waive any and all claims and causes of action ..., whether known or unknown, alleged or unalleged, against DWIC, Daewoo Corporation, Daewoo Engineering and Construction Co. Ltd., KEB, KAMCO and any holder of a Junior Secured Bank Claim or a Remaining Bank Claim who voted to accept the Plan, relating to, or arising from, the restructuring and spin-off of Daewoo Corporation into DWIC, Daewoo Engineering and Construction Ltd. and Daewoo Corporation; *provided, however,* that such release and waiver shall not extend to or cover collection claims that the Creditor Trust may possess based on monetary obligations due and owing to the Debtor.

Order Confirming Amended Plan of Reorganization of Daewoo International (America) Corp. under Chapter 11 of the Bankruptcy Code, February 13, 2002, at 23 (emphasis in original), attached as Exhibit L to Weiner Aff.[2]

**6.** *Failure to State a Claim Under Korean Law.* Defendant argues that, based upon New York's choice of law rules, Korean law applies to all of plaintiff's claims and that, under Korean Law, plaintiff fails to state a claim. In actuality, however, New York law applies to all these claims.

 As to plaintiff's successor liability claims, there is no difference between the laws of New York and Korea. Under New York law, "successor liability will lie when: (1) there is an express or implied agreement to assume the other company's debts and obligations; (2) the transaction was fraudulent; (3) there was a *de facto* merger or consolidation of the companies; or (4) the purchasing company was a mere continuation of the selling company." *Kidz Cloz, Inc. v. Officially for Kids, Inc.,* 00 Civ. 6270, 2002 WL 1586877, *4–5, 2002 U.S. Dist. LEXIS 13058, *13–*14 (S.D.N.Y. July 16, 2002). Similarly, under Korean Law, successor liability lies when the corporation that is the result of a spin-off is a mere continuation of the predecessor corporation. *See* Declaration of Won Hyun Choi, January 18, 2005, ¶¶ 8, 11, Ex. B at Art. 530–9(1). Since there is no conflict between New York and Korean law on this claim, New York applies to the successor liability claim. *See Booking v. Gen'l Star Mgt. Co.,* 254 F.3d 414, 419 (2d Cir.2001) (citing *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (N.Y.1993)). Moreover, since, according to defendant, plaintiff's unjust enrichment claim is, in the context of this lawsuit, controlled by the law of successor liability, *see* Def. Mem. at 32, there is, again, no conflict as to that claim, and New York law therefore governs that claim as well.

 As to plaintiff's fraudulent conveyance claims, there may be a difference in the laws of the two jurisdictions. But applying New York's choice of law "interest analysis,"[3] New York substantive law

---

**2.** Moreover, the Court concludes that the reservation of claims contained in the Plan of Reorganization reasonably identified the relevant claims to be carved-out. *See In re I.*

*Appel Corp.,* 300 B.R. 564, 568–69 (S.D.N.Y. 2003).

**3.** "Under an interest analysis, the law of the jurisdiction having the greatest interest in the

would clearly be chosen. For on thing, where the parties are diverse, as here, the situs of the injury, here New York, generally determines the governing substantive law. *See Gray v. Busch Entertainment Corp.*, 886 F.2d 14, 15 (2d Cir.1989). Moreover, the New York Fraudulent Conveyance Act "was enacted to enable creditors to know with certainty that they could rely upon property of their debtors, even if situated in another jurisdiction." *Advanced Porfolio Techs., Inc.*, 1999 WL 64283, **5–6, 1999 U.S. Dist. LEXIS 1265, at *16 (citations omitted). Hence, "it is established that New York has an 'especially strong' interest in applying its law when one of its domiciliaries alleges that it has been defrauded." *Id.* (citations omitted).

■ 7. *Failure to State a Claim Under New York Law.* Defendant's final assertion is that, even if New York law applies, plaintiff's three fraudulent conveyance claims fail to state a cause of action under, respectively, §§ 273, 274, and 276 of New York Debtor and Creditor Law (also known as the New York Fraudulent Conveyance Statute).[4]

Specifically, as to §§ 273 and 274, defendant alleges that, because these sections forbid a species of fraud, they must be pled with particularity, *see* Rule 9(b), Fed. R.Civ.P., a requirement, defendant says, has not been met here. However, the

sections of New York law here at issue deal with constructive fraud, whereby certain transactions are fraudulent as a matter of law because of when or for what consideration they were made, and not because they were undertaken with fraudulent intent. This is not the kind of fraud to which Rule 9(b) applies. *See Feist v. Druckerman*, 70 F.2d 333, 334 (2d Cir. 1934) (§ 273); *In re Corcoran*, 246 B.R. 152, 158–59 (E.D.N.Y.2000) (§ 274); *see also Bulkmatic Transport Co. v. Pappas*, 99 Civ. 12070, 2001 WL 882039, *12, 2001 U.S. Dist. LEXIS 6894, at *38 (S.D.N.Y. May 11, 2001) ("In pleading constructive fraud [under N.Y. Debtor and Creditor Law § 273], as opposed to actual fraud, a claimant must comply only with the more liberal pleading requirements of Rule 8"). Here, plaintiff has met the bare-bones pleading requirements of Rule 8, Fed. R.Civ.P., by alleging the basic elements of each statute.

As to § 276:

A party seeking to set aside a fraudulent conveyance under § 276 must plead an actual intent to defraud with particularity sufficient to meet the heightened standard of Fed.R.Civ.P. 9(b). Nevertheless, because direct proof of fraudulent intent is usually difficult to obtain, such intent may be inferred from circumstantial evidence, or "badges of fraud." This evidence may

---

application of its law to the litigation in question will apply. The relevant factors in conducting this analysis are the nature of the legal issue in conflict, the policy or purpose supporting the provision in conflict, and an examination of the contacts of the competing jurisdictions to determine which jurisdiction has the greatest concern with the specific issue in question." *Advanced Porfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*, 94 Civ. 5620, 1996 WL 51190, **5–6, 1999 U.S. Dist. LEXIS 1265, at *16 (S.D.N.Y. Feb. 8, 1999) (citations omitted).

4. Defendant's additional contention that the New York Fraudulent Conveyance Statute ought not to be given extraterritorial application is unfounded. *See, e.g., Advanced Porfolio Techs., Inc.*, 1996 WL 51190, **5–7, 1999 U.S. Dist. LEXIS 1265, at *16–*18 (applying New York Fraudulent Conveyance Statute to conveyances that occurred in England) (citations omitted); *Elgin Sweeper Co. v. Melson, Inc.*, 884 F.Supp. 641, 649–50 (N.D.N.Y.1995) (applying New York Fraudulent Conveyance Statute to conveyances that occurred in Canada).

consist of: (1) the inadequacy of consideration received in the allegedly fraudulent conveyance; (2) the close relationship between parties to the transfer; (3) information that the transferor was rendered insolvent by the conveyance; (4) suspicious timing of transactions or existence of a pattern after the debt had been incurred or a legal action against the debtor had been threatened; or (5) the use of fictitious parties. *Bulkmatic Transport Co.*, 2001 WL 882039, **11–12, 2001 U.S. Dist. LEXIS 6894, at *35–*36 (citing *Securities Investor Protection Corp. v. Stratton Oakmont*, 234 B.R. 293, 315–16 (Bankr.S.D.N.Y.1999)); *see also Am. Tissue v. Donaldson*, 351 F.Supp.2d 79, 106–07 (S.D.N.Y.2004). Here, plaintiff's allegations meet these requirements. *See* Am. Compl. ¶¶ 51, 59–66, 71–77, 98.[5]

For the aforementioned reasons, the Court, by Order dated May 20, 2005, denied defendant's motion to dismiss in its entirety.

---

**5.** Defendant's contention that plaintiff's § 276 claim fails because the assets transferred to DWEC as a result of the Spin–Off were "used to satisfy antecedent debts owed to creditors of DWC" (and hence would satisfy the fair consideration requirement), Def. Mem. at 39, is unpersuasive because the question of whether a transfer is made for fair consideration is a question of fact most suitably resolved at the summary judgment stage. *See Am. Tissue*, 351 F.Supp.2d at 105–06.