■ INTERNATIONALE NEDERLANDEN (U.S.) CAPITAL CORPORATION et al., Appellants, et al., Plaintiffs, v BANKERS TRUST COMPANY et al., Respondents. [689 NYS2d 455] —Order, Supreme Court, New York County (Ira Gammerman, J.), entered January 21, 1998, granting the separate CPLR 3211 motions of the respective defendants to dismiss plaintiffs' amended complaint and implicitly denying plaintiffs' motion for leave to replead, unanimously modified, on the law, defendants' motions denied

and plaintiffs' motion granted to the extent of permitting plaintiffs to file an amended complaint asserting a breach of contract claim against Bankers Trust Company on behalf of Internationale Nederlanden (U.S.) Capital Corporation and Internationale Nederlanden (U.S.) Securities Corp. (hereafter referred to collectively as ING) alone, and negligence and third-party beneficiary breach of contract claims against Donlin, Recano & Company, Inc. (Donlin) on behalf of all plaintiffs-appellants, and otherwise affirmed, with costs payable by defendants to plaintiffs-appellants.

This action arises out of the reorganization of Hillsborough Holdings Corp. and related entities (the Debtors). Plaintiffs were beneficial owners of notes issued by the Debtors. The Bankruptcy Court set up an election in which creditors such as plaintiffs were required to vote for one of the competing reorganization plans, and also to select the type of distribution they wanted in exchange for their notes (e.g., various combinations of cash, notes or common stock in the reorganized debtor corporations). The essence of the complaint is that defendants were negligent in completing and recording plaintiffs' master ballots, such that plaintiffs received a less valuable typè of distribution than what they had selected.

ING were the beneficial owners of certain Senior Subordinated Extended Reset Notes (U-4 Notes) and Series B Senior Notes (S-6 Notes) issued and guaranteed by the Debtors. ING was also the pledgee of U-4 and S-6 Notes owned by the other plaintiffs-appellants (collectively the Slifka Entities) and S-6 Notes owned by the plaintiffs (collectively the Farallon Entities). All together, ING held $11,550,386.87 worth of U-4 Notes and $19,091,000 worth of S-6 Notes.

The Debtors filed for bankruptcy in 1989 in the United States District Court for the Middle District of Florida. In August 1994, the Bankruptcy Court submitted two competing plans of reorganization for the creditors to choose, one of which included the distribution election options mentioned above. Under the second plan, beneficial owners of U-4 Notes could elect to receive all or a portion of their distribution in cash and New Senior Notes. If they failed to make the U-4 Election, the default option was for them to receive New Common Stock. Similarly, beneficial owners of S-6 Notes could elect to receive New Senior Notes. Failure to make the S-6 Election would result in a distribution of cash and New Common Stock.

The court's August 2, 1994 order set forth the election procedure and the competing options. Defendant Donlin was designated the balloting agent. Donlin was supposed to distrib-

ute Transmittal Packages containing ballots and instructions to the beneficial owners of U-4 and S-6 Notes by August 19, 1994. The individual owners were then required to fill out the ballots and send them to their broker, bank or nominee. The broker, bank or nominee had to consolidate the results on a Master Ballot and send it to Donlin by September 23, 1994. It was Donlin's duty to tabulate the results so that the method of distribution could be determined. Donlin was also obligated to return any defective Master Ballots to the broker, bank or nominee for correction, but only until September 21.

The Transmittal Package put all interested parties on notice that "[i]f the applicable election is not properly completed on the ballot, it will be treated as if the election had not been made." Accordingly, it was foreseeable by defendants that errors in preparing and recording Master Ballots could cause forfeiture of ING's rights, even if there was no doubt that ING had intended to make the U-4 and S-6 Elections and properly recorded its choices.

On or about May 23, 1990, ING had entered into a Custodian Account Agreement with defendant Bankers Trust Company, under which Bankers Trust Company was to be custodian and record holder of the notes, and to follow plaintiffs' instructions with respect to the notes. Thus, ING sent plaintiffs' ballots to Bankers Trust Company, and Bankers Trust Company was responsible for sending Donlin a timely and accurate Master Ballot.

It is not disputed that ING made the U-4 and S-6 Elections on the ballots it submitted to Bankers Trust Company on behalf of ING's own notes and those pledged to it by the other plaintiffs. The contested issue here is which of the defendants' negligence was responsible for the fact that ING's elections were not properly tabulated and therefore not given effect by the Bankruptcy Court.

Donlin received a Federal Express package from Bankers Trust Company on September 23. Bankers Trust Company claims that on September 26 one of its employees spoke with a Donlin employee who confirmed receipt of plaintiffs' Master Ballot and did not indicate that there were any problems with it.

In fact, in December 1994, Donlin acted as if plaintiffs' elections were effective. When the final plan of reorganization was adopted by the Bankruptcy Court on December 9, 1994, creditors who had made the U-4 Election were entitled to make a further U-4 Exchange Election to receive more Senior Notes instead of stock. Donlin sent Bankers Trust Company a ballot

package for ING to make the U-4 Exchange Election, with a letter stating that the "records of the Balloting Agent reflect that you previously cast a timely Master Ballot on which was recorded * * * the Subordinated Note Claim Elections [the U-4 Elections] exercised by the beneficial owners * * * of the Senior Subordinated Notes".

However, Donlin now claims that Bankers Trust Company was entirely at fault for the debacle. Donlin denies receiving a Master Ballot from Bankers Trust Company at all. Alternatively, it argues that if Bankers Trust Company did send the Master Ballot, Donlin had no duty to tabulate it, because Bankers Trust Company filled it out incorrectly but sent it too late to trigger Donlin's obligation to send it back for corrections. Plaintiff agrees that Bankers Trust Company made several errors on the Master Ballot. For instance, Bankers Trust Company incorrectly identified the beneficial owners and named itself as the record holder even though this was not the case. In addition, though the Transmittal Package stated that the Master Ballot should be submitted by the record holder, Bankers Trust Company submitted the Ballot in its own name.

Not surprisingly, Bankers Trust Company argues that Donlin should be solely liable, because of a limitation of liability clause in the Custodian Account Agreement between ING and Bankers Trust Company. Specifically, ING promised to "indemnify you and hold you harmless from any and all loss, liability (*excluding any liability occasioned by the gross negligence or willful misconduct of your employees,* or by robbery, burglary or theft of any securities while in your physical possession), claims, damages or expenses * * * arising from your performance of your services as Custodian, hereunder" (emphasis added). Any clerical errors on the Master Ballot cannot amount to gross negligence, Bankers Trust Company contends. The Agreement also stated that Bankers Trust Company "assume[d] no liability to any customer of [ING] or to any beneficiary for which [ING] may be acting as agent, bailee or fiduciary." This language, Bankers Trust Company argues, relieves it of all liability to the Slifka and Farallon Entities.

When defendants' errors came to light, the Debtors made a motion before the Bankruptcy Court on April 6, 1995, asking it to honor ING's elections. Although the Bankruptcy Court acknowledged that ING had properly made the U-4 and U-4 Exchange Elections and chastised Donlin for its incompetence, the court decided that it could not honor ING's elections because they had not been recorded on the appropriate list.

ING subsequently learned that the S-6 Election was not

given effect either. The Debtors argued that the S-6 Election should not be recognized because of errors in the Master Ballot submitted by Bankers Trust Company. Plaintiffs and the Debtors settled this dispute, but the Release did not cover the U-4 and U-4 Exchange Elections.

Plaintiffs thus found themselves deprived of the benefit of the U-4 Elections, through no fault of their own. They estimated their loss at $5 million. They brought the instant action against Donlin and Bankers Trust Company. The amended complaint, dated March 25, 1997, asserted four causes of action: gross negligence and breach of fiduciary duty by Bankers Trust Company, and breach of contract (under a third-party beneficiary theory) and negligence by Donlin. Plaintiffs also sought punitive damages.

Defendants filed separate CPLR 3211 motions to dismiss the complaint. In plaintiffs' opposition papers, they asked for leave to replead if defendants' motions were granted. The IAS Court granted the motions in their entirety. It dismissed the gross negligence and breach of fiduciary duty claims against Bankers Trust Company on the grounds that plaintiff did not allege any separate tortious breach of duty independent of a breach of the Custodian Account Agreement. The motion court also dismissed the causes of action against Donlin, summarily asserting that plaintiffs pleaded no facts showing either a duty owed by Donlin to plaintiffs or an intent to benefit plaintiffs as third-party beneficiary. The court did not address plaintiffs' request to replead, but implicitly denied it.

The motion court erred in granting defendants' motions, since plaintiffs' complaint contains factual allegations sufficient to support claims against Bankers Trust Company and Donlin. Having determined that plaintiffs' tort claims against Bankers Trust Company were actually breach of contract claims, the court should have granted plaintiffs' request for leave to replead. The motion court also erred in concluding that Donlin owed no duty to plaintiffs. However, the court properly found that the terms of the Custodian Account Agreement would relieve Bankers Trust of liability to the Slifka and Farallon Entities even if Bankers Trust Company were found to have been grossly negligent.

In deciding a motion to dismiss, the factual allegations in the complaint must be deemed true (*Matco Elec. Co. v Plaza Del Sol Constr. Corp.*, 82 AD2d 979). Significantly, even defendants admit certain essential facts. Plaintiffs properly filled out their ballots and made the U-4 Elections, but due to negligence somewhere along the line, these elections were not

properly tabulated and therefore not honored. The only real question is whether the fault lies with Donlin, Bankers Trust Company, or both. Realizing this, defendants attempt to show that they had no duty to behave any better towards plaintiffs. However, their arguments lack merit.

At the outset, we note that the motion court properly deemed plaintiffs' cause of action against Bankers Trust Company to sound in contract, not tort. The duty to plaintiffs which Bankers Trust Company allegedly breached, namely the duty to follow plaintiffs' instructions with respect to the disposition of the U-4 Notes, arose out of the Custodian Account Agreement. Allegations that a defendant was grossly negligent in failing to perform its contractual duty do not transform a breach of contract action into a tort action (*Clark-Fitzpatrick, Inc. v Long Is. R. R. Co.*, 70 NY2d 382, 390).

The motion court's decision did not explicitly address whether the alleged errors by Bankers Trust Company in filling out and sending the Master Ballot could constitute gross negligence. Though some of the errors seem to concern mere formalistic details, this was an election in which minor errors of form could have drastic consequences, as evinced by the Bankruptcy Court's failure to honor plaintiffs' undisputed election choices because they were not listed on Donlin's schedule (*compare, Babitt v New York Tel. Co.*, 63 Misc 2d 883, 884-885). Assuming for the purposes of this motion that plaintiffs' assessment of their damages is accurate, Bankers Trust Company was well aware that millions of dollars were at stake. Failure to keep accurate records has been considered evidence of gross negligence where the plaintiff relied on the defendant to protect its property interests and the defendant was aware that significant losses could result from inaccurate records (*see, Rand & Paseka Mfg. Co. v Holmes Protection*, 130 AD2d 429, 431, *lv denied* 70 NY2d 615 [security company failed to keep accurate records of jewelry store's operating hours]).

Under one theory of the case, ING's loss occurred because Bankers Trust Company failed to follow the instructions for completing the Master Ballot and then either failed to send it to Donlin, or sent it too late for the fatal mistakes to be corrected (*see, Food Pageant v Consolidated Edison Co.*, 54 NY2d 167, 173 [several acts of negligence with foreseeably severe cumulative effect deemed gross negligence]). Although the Master Ballot was never sent, or was too error-ridden to be counted by Donlin, Bankers Trust Company reassured ING that everything was in order, until it was too late for ING to do anything about it. Certainly the failure to send the Master

Ballot at all, if proven, could be gross negligence. The essence of the agreement between ING and Bankers Trust Company was that ING relied on Bankers Trust Company to stand in ING's stead with respect to the U-4 Notes and to protect ING's rights, all of which Bankers Trust Company allegedly failed to do (*see, Meinhard-Commercial Corp. v Sydney*, 109 AD2d 678 [denying lender's motion to dismiss gross negligence claim against accountants hired to investigate credit of proposed borrower]). At this early stage, where no discovery has been conducted, we cannot say as a matter of law that Bankers Trust Company fulfilled its obligations under the Custodian Account Agreement. "Where the inquiry is to the existence or nonexistence of gross negligence, the ultimate standard of care is different [from ordinary negligence], but the question nevertheless remains a matter for jury determination" (*Food Pageant v Consolidated Edison Co., supra*, at 173).

The motion court also erred in holding that plaintiffs could not hold Donlin liable as third-party beneficiaries of the retention agreement between Donlin and the Debtors. A third party seeking to recover on a contract must establish that a binding contract exists between other parties; that this contract was intended for his benefit; and that the benefit to him was direct rather than incidental (*see, Port Chester Elec. Constr. Corp. v Atlas*, 40 NY2d 652, 655-656). Courts should look at the overall purpose of the transaction. "No other purpose [of the agreement] appearing than to benefit the two classes of creditors named, they are to be considered beneficiaries" (*McClare v Massachusetts Bonding & Ins. Co.*, 266 NY 371, 377). Here, the sole purpose of the Debtors in retaining Donlin was to effectuate the creditors' wishes in the reorganization. Performance was to be rendered directly to plaintiffs (or their agent, Bankers Trust Company), which is further evidence of a third-party beneficiary relationship (*Goodman-Marks Assocs. v Westbury Post Assocs.*, 70 AD2d 145, 148).

Contrary to Donlin's argument, it is not dispositive that their retention agreement does not explicitly name creditors such as plaintiffs to be third-party beneficiaries. "It is not essential to the creation of a right in a creditor beneficiary * * * that he be identified when the obligation is made" (*McClare v Massachusetts Bonding & Ins. Co., supra*, at 379-380). By taking sole responsibility for coordinating their choice of reorganization options, Donlin assumed obligations to plaintiffs.

Alternatively, plaintiffs have asserted a negligence claim against Donlin. We reject Donlin's argument that plaintiffs were not within its zone of duty. As the Court of Appeals

emphasized in *White v Guarente* (43 NY2d 356, 361 [holding accountant liable to individual limited partners who relied on its performance of services to partnership]), defendant's "services * * * were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit and made up of certain components". Plaintiffs here had a greater and more foreseeable stake in Donlin's careful performance of its obligations than did the public at large. In fact, plaintiffs and the other creditors were the ones with the strongest interest in the elections that Donlin was appointed to administrate. Their reliance on Donlin to protect their interests through fair and competent ballot tabulation was not only foreseeable (*see, Meinhard-Commercial Corp. v Sydney, supra*, at 678), but actually mandated by the Bankruptcy Court. In such a situation, the absence of formal privity between plaintiffs and Donlin should not relieve Donlin of liability (*Strauss v Belle Realty Co.*, 65 NY2d 399, 402).

Accordingly, the motion court's order should be reversed to permit plaintiffs to file an amended complaint asserting a breach of contract claim against Bankers Trust Company on behalf of ING alone, and negligence and third-party beneficiary breach of contract claims against Donlin on behalf of all plaintiffs. Concur—Rosenberger, J. P., Tom, Wallach and Mazzarelli, JJ.