(January 18, 2011)

■ CREDIT SUISSE FIRST BOSTON, Respondent, v UTRECHT-AMERICA FINANCE CO. et al., Appellants. [915 NYS2d 531]—

Order, Supreme Court, New York County (Eileen Bransten, J.), entered February 3, 2010, which, to the extent appealed from, partially granted plaintiff's motion for summary judgment on its first cause of action and declined to search the record to dismiss the second and fourth causes of action, unanimously reversed, on the law, plaintiff's motion denied and the second and fourth causes of action dismissed, with costs.

This action for breach of contract arises out of defendant Utrecht-America's oral agreement (made through its agent, defendant Rabobank) to sell distressed assets to plaintiff (the trade) consisting of defendant's interest in a May 28, 1999 loan to nonparty Choctaw Investors B.V., a Dutch limited liability company, for 62.5 cents on the dollar. As a special financing vehicle for Enron Corporation, Choctaw included among the significant intangible assets securing the loan its rights to a letter of indemnity provided by Enron, then involved in bankruptcy proceedings. On November 5, 2003, plaintiff sent written confirmation of the trade subject to the standard terms and conditions for distressed trade confirmations published by the Loan Syndications and Trading Association, Inc. (LSTA), which include the parties' representations that each has independently ascertained the obligor's business and financial condition and that, irrespective of information that may have come into possession of the other party, has decided to enter into the transac-

tion notwithstanding its lack of such information. The parties specifically agreed that included with the loan documentation defendants were obligated to provide was a "copy of the Credit Agreement (including all schedules, and, if requested by Buyer, exhibits, and any other related documentation reasonably requested by Buyer)."

The confirmation specified that the trade would be subject to credit documentation, and by November 17, 2003, plaintiff's counsel had received the closing documents for the Choctaw loan. Several days later, plaintiff learned that Choctaw had been dissolved. Negotiations dragged on through December and into January as plaintiff sought to ascertain whether the transfer of the Choctaw collateral to the collateral agent, JP Morgan Chase (Chase), was effective under Dutch law. On the morning of January 14, 2004, defendant's attorney was informed that plaintiff was "ready to move forward on its purchase from Utrecht." However, that very afternoon, defendant sent a letter to plaintiff terminating the agreement due to plaintiff's failure to consummate the purchase, and Rabobank, as defendant's agent, determined to terminate the trade.

On January 21, 2004, it was announced that a settlement had been reached between the various lenders to Choctaw and the Enron bankruptcy estate, a development that had the effect of substantially increasing the value of the Choctaw assets. Within the week, defendant reached an agreement with third parties for the transfer of its interest in the Choctaw loan at a price above par, and in early February, plaintiff bought additional Choctaw debt to effect cover of the terminated trade with Utrecht-America.

Plaintiff commenced this action for breach of contract against Utrecht-America and Rabobank, respectively (causes of action one and two), including breach of the covenant of good faith and fair dealing (causes of action three and four). Following discovery, the parties agreed that Rabobank would "satisfy and guarantee payment of any final unappealable judgment against . . . Utrecht-America" and plaintiff would not pursue a claim based on the alleged status of Rabobank as Utrecht-America's alter ego. Plaintiff thereafter brought this motion for summary judgment, excusing its delay in closing the trade on the need to complete documentation review, in particular, to resolve issues with respect to the collateral and to conform the representations and warranties in connection with the transfer to those contained in the original loan documents.

Defendants opposed the motion and moved to dismiss the complaint for failure to state a cause of action (CPLR 3211 [a]

[7]). Although their expert agreed that nonconforming representations and warranties would be a last resort because of the adverse effect on marketability, he stated that plaintiff's conduct did not comply with the customs and practices of the distressed debt market in numerous material respects. For instance, he noted that if plaintiff had any legitimate concerns regarding the effectiveness of the transfer of assets from Choctaw to Chase, as collateral agent, it had only to contact Chase or its counsel for clarification. Similarly, if plaintiff believed it needed further information about the transfer of collateral, it would have been customary to contact both Chase and the original lenders to Choctaw, with whom plaintiff had pending trades. The expert concluded that in light of plaintiff's receipt of the Choctaw loan documentation in mid-November 2003, plaintiff's redundant request for similar information in January 2004 raised the question of whether plaintiff evinced a good faith intent to close the trade.

There is a triable issue of fact as to whether plaintiff negotiated with Utrecht-America in good faith. This issue, "which necessitates examination of a state of mind, is not an issue which is readily determinable on a motion for summary judgment" (*Coan v Estate of Chapin*, 156 AD2d 318, 319 [1989]; *see also Brookfield Indus. v Goldman*, 87 AD2d 752, 753 [1982]; *cf. IDT Corp. v Tyco Group, S.A.R.L.*, 13 NY3d 209, 214 [2009] [settlement agreement subject to good faith negotiation of further agreements]). Defendants' expert, who may be called to testify concerning the practices of an industry (*see AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 594 [2005]), opined that plaintiff's negotiations were inconsistent with those customary to the distressed debt market, and while the availability of a more prudent course of conduct does not preclude a party from demonstrating its good faith (*see Polotti v Flemming*, 277 F2d 864, 868 [2d Cir 1960]), it presents a factual issue for resolution at trial. At such time, the weight to be afforded to the expert opinion is within the province of the trier of fact (*see Rivera v City of New York*, 212 AD2d 403, 404 [1995]).

We note that the obligation to negotiate in good faith "bar[s] a party from . . . insisting on conditions that do not conform to the preliminary agreement" (*Teachers Ins. & Annuity Assn. of Am. v Tribune Co.*, 670 F Supp 491, 498 [SD NY 1987]). The parties having agreed to the terms and conditions promulgated by LSTA governing the confirmation, defendants were under no obligation to supply information sought by plaintiff in regard to Choctaw's bankruptcy, much of which defendants produced

nonetheless. While documentation concerning the transfer of Choctaw's collateral or the status of the Enron indemnity letter might fall under the category of "any other . . . documentation [related to the Credit Agreement] reasonably requested by Buyer," which defendants were obligated to provide, the issue of whether plaintiff's request for the same was reasonable presents a question of fact not amenable to summary resolution (*see e.g. Wilson Trading Corp. v David Ferguson, Ltd.*, 23 NY2d 398, 406 [1968]).

The duty of good faith and fair dealing is an implicit obligation imposed on the parties to a commercial transaction (*see Dalton v Educational Testing Serv.*, 87 NY2d 384, 389 [1995]). The cause of action for breach of the duty merely duplicates the cause of action for breach of contract and was properly dismissed as redundant (*e.g. Levi v Utica First Ins. Co.*, 12 AD3d 256, 257-258 [2004]) because a court, where appropriate, will enforce the obligation on contracting parties (*see Murphy v American Home Prods. Corp.*, 58 NY2d 293, 304 [1983]).

As to plaintiff's claims based on Rabobank's status as Utrecht-America's alter ego, "[t]he party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene" (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 142 [1993]). "An inference of abuse does not arise . . . where a corporation was formed for legal purposes or is engaged in legitimate business" (*TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335, 339-340 [1998]). It is undisputed that Rabobank was formed for legal purposes and was engaged in a legitimate business. Moreover, in an unappealed portion of the order under review, the court denied plaintiff's motion for summary judgment against Rabobank because plaintiff failed to show that Rabobank used Utrecht-America "to commit fraud or malfeasance or other inequity." In view of such finding, defendants' request to dismiss the alter-ego claims against Rabobank should have been granted.

Finally, defendants' contention that the motion court correctly found that the parties failed to enter into a fully binding preliminary agreement but, instead, entered into an agreement to negotiate in good faith is not cognizable. Defendants' motion only sought dismissal of plaintiff's third cause of action for breach of the covenant of good faith and fair dealing against Utrecht-America, and their contention is impermissibly raised for the first time on appeal (*see Recovery Consultants v Shih-Hsieh*, 141 AD2d 272, 276 [1988]). In any event, an interpreta-

tion that renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is preferred (*see Wood v Duff-Gordon*, 222 NY 88 [1917]; *Curtis Props. Corp. v Greif Cos.*, 212 AD2d 259, 265-266 [1995]), particularly where, as here, the parties have expressed their intent to be contractually bound in a writing (*see Four Seasons Hotels v Vinnik*, 127 AD2d 310, 317 [1987]). To the extent the writing is equivocal, as defendants maintain, the issue is for the trier of fact (*id.*). Concur—Gonzalez, P.J., Tom, Catterson and Richter, JJ.