S.A. De Obras y Servicios, COPASA v Bank of Nova Scotia (2019 NY Slip Op 01706)





S.A. De Obras y Servicios, COPASA v Bank of Nova Scotia


2019 NY Slip Op 01706


Decided on March 12, 2019


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 12, 2019

Acosta, P.J., Friedman, Kapnick, Webber, Moulton, JJ.


651649/13 7509 651555/12 7508

[*1]S.A. De Obras y Servicios, COPASA, Plaintiff-Appellant,
v
The Bank of Nova Scotia, et al., Defendants-Respondents.
Cointer Chile, S.A., et al., Plaintiffs-Appellants-Respondents,
v
Bank of Nova Scotia, et al., Defendants-Respondents-Appellants.


Wilk Auslander LLP, New York (Jay S. Auslander of counsel), for appellant.
Quinn Emanuel Urquhart & Sullivan, LLP, New York (Stephen A. Broome of counsel), for appellants-respondents.
Sherman & Sterling LLP, New York (Daniel H.R. Laguardia of counsel), for respondents/respondents-appellants.



Order, Supreme Court, New York County (O. Peter Sherwood, J.), entered January 17, 2018, which granted defendants' motion for summary judgment dismissing the complaint in index no. 651649/13 and the first cause of action in index no. 651555/12, and denied their motion for summary judgment dismissing the sixth cause of action in index no. 651555/12, unanimously modified, on the law, to deny defendants' motion for summary judgment dismissing the complaint in index no. 651649/13 and the first cause of action in index no. 651555/12, and otherwise affirmed, without costs.
These actions arise out of a highway project in Chile. In September 2009, the Chilean government issued a request for proposals (RFP) to improve, maintain, and operate part of a toll road (Route 5, or Ruta 5 in Spanish). Under the terms of the RFP, bidders provided the lowest present value (or VPI [FN1]) that they would accept in return for building and operating the toll road. The bidder with the lowest VPI would win the bid, and if that bidder was able to form a concession company and build and operate the toll road pursuant to the government's requirements, it would be entitled to receive the revenues from the toll road until such revenues reached the VPI bid, or for 35 years, whichever came first. The Chilean Government required each bidder to submit a bid bond that would be forfeited if a bidder won the bid but then failed to form the concession company.
S.A. de Obra y Servicios, COPASA (COPASA) (the plaintiff in index no. 651649/13) and Cointer Chile S.A. and Azvi Chile, S.A. Agencia en Chile (the plaintiffs in index no. 651555/12) (together, Cointer) retained defendant Bank of Nova Scotia and Scotiabank Global Banking and Markets (Scotia) as their exclusive financial advisors in connection with the Ruta 5 [*2]project.
The parties' March 2010 engagement letter provided that Scotia would be paid only if COPASA and Cointer "successfully reach[ed] financial close"; this payment — called a Success Fee — could not exceed $975,000. The engagement letter also included an exculpatory clause that limited defendants' liability "for any direct loss or damage. . . arising from or in connection with the services provided . . . however the direct loss or damage is caused including negligence or willful misconduct by defendant" to 50% of the amount of the Success Fee actually received by [defendant]" (emphasis added).
The engagement letter further described the "proposed core team" that would be working on the Ruta 5 project. This team included a Managing Director (Kelly), a Director (Carneiro), an Associate Director (Mégret), and an Associate (Bodden). As provided in the engagement letter Kelly was to oversee the engagement assisted by the other three team members.
Defendants' responsibilities included preparation of a bid model. Defendants conceded in their answer that the bid model submitted to plaintiffs was based on an inaccurate assumption that toll revenues would begin to accrue immediately upon commencement of the construction of the highway, as opposed to following the highway's completion. As a result of the error, COPASA and Cointer submitted a bid that undervalued VPI by approximately $82-84 million. Once the error was discovered, COPASA decided to withdraw from the Ruta 5 project.
Cointer and Scotia attempted to salvage the Ruta 5 project by bringing in an additional partner, nonparty SNC Lavalin. In October 2011, Scotia sent Cointer a memo proposing the terms of the new arrangement (October 2011 memo). The October 2011 memo begins, "The information contained in this memo is being provided for discussion purposes only." It goes on to propose, inter alia, the equity that the various parties would provide for the Ruta 5 project. The October 2011 memo ends with a request to "confirm acceptance of this offer by way of return email." Cointer's president signed the October 2011 memo and it was returned to Scotia. At Cointer's request, Scotia later sent them a copy of the October 2011 memo, signed by Scotia. Defendants maintain that the October 2011 memo, it was merely an agreement to agree while Cointer asserts that it was an enforceable contract. Scotia subsequently informed Cointer that it would no longer be participating in the project. As a result Cointer had to abandon the project. Both COPASA and Cointer forfeited their shares of the bid bond.
COPASA's sole cause of action, and Cointer's first cause of action, is for breach of the March 2010 engagement letter. COPASA and Cointer allege that Scotia was grossly negligent by providing them with a bid model that undervalued VPI by $82-84 million. Both plaintiffs sued for damages arising from the bid bond they had to forfeit, the profit they would have made if defendants had calculated the VPI correctly,[FN2] and compensation for the damage caused to their reputations when they had to withdraw from the project.
Scotia moved to dismiss pursuant to CPLR 3211. Supreme Court dismissed the causes of action alleging breach of the March 2010 engagement letter, finding that the allegations did not amount to gross negligence sufficient to overcome the exculpatory clause. Supreme Court converted the motion to dismiss Cointer's sixth cause of action based on the October 2011 memo to a motion for summary judgment and denied that motion.
Both sides appealed. This court modified to reinstate COPASA's complaint and Cointer's first cause of action, and otherwise affirmed (S.A. de Obras y Servicios, Copasa v Bank of Nova Scotia, 126 AD3d 582 [1st Dept 2015]). We noted that "[a]t this stage of the litigation, prior to key depositions being held the contract-based claims for gross negligence should not have been dismissed" (id. at 583 [citations omitted]).
Following discovery defendants moved for summary judgment dismissing the complaints on the ground that there was no evidence of gross negligence. Defendants submitted, inter alia, [*3]evidence that Scotia spent months working on the bid model; that plaintiffs' own expert conceded that Bodden was qualified to build the model; that Bodden worked in conjunction with Carneiro in building the bid model; that Carneiro checked the model prior to Scotia sending it to plaintiffs; that Scotia worked with plaintiffs to revise the model over a dozen times; and that plaintiffs conceded that the bid model, with the exception of the VPI error, worked exactly as required. Defendants also submitted their expert's report which concluded that Scotia had used various safeguards designed to reduce the risk of modeling error.
In opposition, plaintiffs submitted, inter alia, undisputed evidence that Scotia failed to follow its own internal audit procedures; that in the weeks leading up to the submission of the bid model, Kelly, the Managing Director, was fired, leaving the remaining personnel in disarray; and that there was conflicting deposition testimony as to whether Mégret served as the secondary modeler for the bid model. Plaintiffs also submitted an expert affidavit which asserted that Scotia's failure to audit the model prior to releasing it to plaintiffs was "an extreme departure" from industry standards for developing and reviewing financial models.
Supreme Court granted defendants' CPLR 3212 motion for summary judgment dismissing the gross negligence claims but denied their motion for summary judgment dismissing the sixth cause of action regarding the October 2011 memo.
We disagree with the conclusion of the Supreme Court regarding the gross negligence claims. The record before us establishes that triable issues of material fact exist as to whether Scotia was grossly negligent in its development of the bid model for the Ruta 5 project. We affirm Supreme Court's denial of Scotia's motion to dismiss the sixth cause of action.
It is well-settled that contractual limitations on liability are generally enforceable (see Uribe v Merchants Bank of N.Y., 91 NY2d 336, 341 [1998]; Metropolitan Life Ins. Co. v Noble Lowndes Intl., 84 NY2d 430, 436 [1994]; Colnagi, U.S.A., Ltd. v Jewelers Protection Servs., Ltd., 81 NY2d 821 [1993]). However, "public policy forbids a party from attempting to avoid liability for damages caused by grossly negligent conduct" (Obremski v Image Bank, Inc., 30 AD3d 1141, 1141-1142 [1st Dept 2006], citing Sommer v Federal Signal Corp., 79 NY2d 540, 554 [1992]). Thus, a gross negligence claim will be sustained where a party's conduct "evinces a reckless disregard for the rights of others or smacks' of intentional wrongdoing" (Colnaghi, U.S.A., 81 NY2d at 823-824; see Food Pageant Inc. v Consolidated Edison Co., 54 NY2d 167, 172 [1981] [gross negligence established by evidence of a party's "failure to exercise even slight care"]; see also Restatement [Second] of Contracts § 195[1] [intentional or reckless conduct vitiates contractual term limiting liability]).
On a motion for summary judgment the court's role is "to determine whether there is a material factual issue to be tried, not to resolve it" (Sommer v Federal Signal Corp., 79 NY2d 540, 554 [1992]). Where two different conclusions may reasonably be reached from the evidence, a motion for summary judgment should be denied (id. at 555 [citing Siegel, NYPrac § 278 at 407 [2nd ed 1991]); see also Food Pageant, Inc., 54 NY2d at 173 ["[w]here the inquiry is to the existence or nonexistence of gross negligence, the ultimate standard of care is different [from ordinary negligence], but the question nevertheless remains a matter for jury determination"]). Plaintiffs have raised an issue of fact as to whether Scotia's conduct in its development of the bid model was grossly negligent. "Whether this indeed is a case of a simple mistake or reckless indifference is for a jury to determine" and summary judgment should have been denied (Sommer, 79 NY2d at 555).
Scotia recognized that modeling error and, specifically, the risk that a model does not conform to the tender documents, was one of the "key risks" of its business. Both COPASA's and Scotia's experts agreed that such risks are inherent in the financial advisory business and so an entity in Scotia's position must implement procedures to effectively guard against such risks.
Scotia maintained a Development and Audit Procedure for preparing and assessing financial models. That procedure required a secondary modeler to review the primary modeler's work to identify potential errors and provided that "[e]ach financial model should be subject to at least three separate internal model audits before bid submission and one audit before financial close." Scotia referred to this internally as a model audit or a "four-eye approach." Bodden, whose colleagues viewed him as "a junior guy needing guidance," was assigned as the primary [*4]modeler. There is conflicting testimony about whether a secondary modeler was assigned: Bodden testified that Mégret filled that role, while Mégret stated that there was "no doubt" in his mind that he was not the secondary modeler. For his part Carneiro stated that he did not think that Mégret "formally reviewed the financial model." Carneiro also acknowledged that the four-eye approach was not followed for the Ruta 5 transaction despite it being the "current existing protocol."
As a result of deviation from the four-eye approach Scotia did not detect the modeling error prior to submission of the bid model, and COPASA and Cointer submitted a bid that was substantially lower than they had intended. Plaintiffs have sufficiently alleged that defendants' conduct evinced a reckless disregard for plaintiff's rights insofar as it failed to comply with, or "actively disregarded, its own policies" (Tillage Commodities Fund, L.P. v SS & C Tech., Inc., 151 AD3d 607, 608 [1st Dept 2017] [citations omitted]; see also Internationale Nederlanden (U.S.) Capital Corp. v Bankers Trust Co., 261 AD2d 117, 122 [1st Dept 1999] [sustaining a claim of gross negligence where the defendant made "minor errors of form" that "could have drastic consequences"]).
A second "key risk" identified by Scotia is "departure or absence of an employee." Nevertheless, in the four weeks leading up to the bid submission, Scotia fired Kelly, the Managing Director of the Ruta 5 project; Carneiro was traveling on a different assignment, and then on vacation, and Carmen Lopez, who Carneiro expected would be taking over for him while he was away, was also fired. Thus, in the critical period prior to the bid submission, Scotia's senior team members on the Ruta 5 project were absent (see Food Pageant, 54 NY2d 167, 171 [gross negligence established by, inter alia, evidence that defendant left an employee in charge who "lack[ed] the necessary experience, knowledge and expertise to completely perform the functions of his job"]).
Finally, COPASA and Cointer's expert opined that Scotia's conduct represented an "extreme departure" from industry standards for the development of financial models. Specifically, plaintiffs' expert stated that "industry standards and best practices — not to mention Scotia's own Development & Audit Procedures — required that the Ruta 5 model be subject to multiple internal audits by an experienced financial modeler who had a thorough understanding of the tender document requirements for this particular project." While Scotia's expert concluded to the contrary, and that Scotia had "utilized numerous safeguards," this issue is one for a jury to resolve (see Southern Wine & Spirits of Am., Inc. v Impact Envtl. Eng'g, PLLC, 104 AD3d 613, 614 [1st Dept 2013] ["an issue of fact exists as to whether [defendant's] conduct was grossly negligent' given plaintiffs' expert affidavit]).
As to the sixth cause of action, on the prior appeal, we found that "[i]ssues of fact exist[ed] as to whether the parties reached a binding preliminary contract giving rise to a duty to negotiate in good faith" (126 AD3d 582, 583 [1st Dept 2015]). The evidence that defendants presented on their current motion was no stronger than the record evidence on the prior motion, and issues of fact exist as to whether the parties reached a binding preliminary contract giving rise to a duty to negotiate in good faith, and, if so, whether Scotia breached it.
The question of whether a party has negotiated in good faith, "which necessitates examination of a state of mind, is not an issue which is readily determinable on a motion for summary judgment" (Credit Suisse First Boston v Utrecht-America Fin. Co., 80 AD3d 485, 487 [*5][1st Dept 2011] [internal quotation marks omitted]).
We have considered defendants' remaining arguments as to the sixth cause of action and find them unavailing.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MARCH 12, 2019
CLERK



Footnotes

Footnote 1: VPI is an acronym for "Valor Presente de los Ingresos," or present value of revenues.

Footnote 2: Plaintiffs assert they would still have been the lowest bidder, and therefore would have been awarded the project, had the defendants calculated the VPI correctly.