# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 21-1368

———————————————

Protégé Biomedical, LLC

*Plaintiff - Appellant*

v.

Duff & Phelps Securities, LLC, and Philip I. Smith

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the District of Minnesota

——————————

Submitted: October 20, 2021
Filed: April 4, 2022
[Unpublished]

——————————

Before GRUENDER, ERICKSON, and STRAS, Circuit Judges.

——————————

PER CURIAM.

Sometimes the unexpected happens in corporate deals. When looking for a buyer for its business, Protégé Biomedical asked Duff & Phelps Securities for help. But rather than looking to complete the deal, the prospective buyer allegedly stole some of Protégé's trade secrets, which led the company to sue Duff & Phelps and

one of its employees, Philip Smith, for damages.  The district court[1] dismissed the case, and we affirm.

I.

Once it received approval from the Food and Drug Administration for one of its medical products, Protégé hoped to sell its business.  But it needed help finding a buyer, so it turned to Duff & Phelps.  The terms of the agreement were simple.  In exchange for trying to find a buyer, Duff & Phelps received immunity from certain types of claims, its employees were largely shielded from individual liability, and it owed no fiduciary duties to Protégé.  And all of these terms, as the parties' contract made clear, were subject to New York law.

Within months, one of Protégé's competitors, Z-Medica, emerged as a potential buyer.  Z-Medica's point person was Doug Schillinger, who sat on the company's board of directors.  Smith had Schillinger sign a nondisclosure agreement, which Protégé thought would bind Z-Medica too.

Based on that assumption, Protégé participated in a conference call to discuss the potential deal with Z-Medica.  At the outset of the call, one of Protégé's co-owners mentioned the nondisclosure agreement and explained that it was the reason why the parties could speak freely about Protégé's nonpublic information.

Unfortunately for Protégé, Z-Medica was not operating under the same assumption.  In its view, Schillinger had signed the nondisclosure agreement in his personal capacity, not as Z-Medica's representative.  So after the call was over, Z-Medica used the information it had learned to create its own competing product.

---

[1]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

Harmed by this turn of events, Protégé first sued Z-Medica. After Z-Medica settled, Protégé turned its attention to Duff & Phelps and Smith, whom it sued in state court. Duff & Phelps removed the case to federal court on the ground that Smith, the only nondiverse defendant, had been fraudulently joined. *See* 28 U.S.C. § 1446. The case made it no further than a motion to dismiss. In the district court's view, Protégé had not alleged a plausible claim for relief. *See* Fed. R. Civ. P. 12(b)(6).

## II.

Before getting to the merits, we need to decide whether this case belongs in federal court. Generally, in a case like this one, the joinder of a nondiverse party like Smith would mean that there is no federal jurisdiction. *See* 28 U.S.C. § 1332 (giving federal courts jurisdiction over cases involving complete diversity of citizenship and an amount-in-controversy over $75,000). But here the district court held that Smith had been "fraudulently joined." *Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806, 809 (8th Cir. 2003).

Fraudulent joinder occurs when "there is no reasonable basis in fact and law for the claim[s] brought" against the nondiverse defendant. *Wivell v. Wells Fargo Bank, N.A.*, 773 F.3d 887, 893 (8th Cir. 2014) (quotation marks omitted). The breach-of-contract claim falls into that category because Smith himself was never a party to a contract with Protégé. *See Mencher v. Weiss*, 114 N.E.2d 177, 179 (N.Y. 1953).[2] The same goes for the unlawful-practice-of-law claim, because Smith, who

---

[2]In New York, an agent like Smith is not "personally bound [to a contract] unless there is clear and explicit evidence of the agent's intention to . . . []add his personal liability [to] that of his principal." *Savoy Record Co. v. Cardinal Export Corp.*, 203 N.E.2d 206, 207 (N.Y. 1964) (quoting *Mencher*, 114 N.E.2d at 179). The parties' contract establishes exactly the opposite here: the obligations were "solely corporate," and no Duff & Phelps employee was "subject[] to any liability." So

-3-

is not a lawyer, never gave legal advice to Protégé. *See Gardner v. Conway*, 48 N.W.2d 788, 796–97 (Minn. 1951). Meanwhile, the contract itself immunizes Smith from a breach-of-professional services claim, which is based in negligence. *See Hydro Inv., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) (applying New York law). And finally, the remaining claims—for breach-of-fiduciary and principal-agent duties—fail because neither Smith nor Duff & Phelps ever served as Protégé's fiduciary. *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (applying New York law); *see Meese v. Miller*, 436 N.Y.S.2d 496, 499 (N.Y. App. Div. 1981). In short, without a viable claim against Smith,[3] the case can remain in federal court.

## III.

Only the claims against Duff & Phelps remain. The district court dismissed them all for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Protégé's primary claim is for breach of contract. According to the complaint, Duff & Phelps breached the parties' contract when it failed to prevent Protégé from disclosing *its own* proprietary information during the call. The problem, however, is that the only contractual duties that Protégé identifies are those that make Duff &

---

Protégé had "no reasonable basis in fact and law" to sue Smith for breach of contract. *Wivell*, 773 F.3d at 893 (quotation marks omitted).

[3]No writ of mandamus is available because Protégé has other adequate legal remedies. *See Madison Equities, Inc. v. Crockarell*, 889 N.W.2d 568, 571 (Minn. 2017). And the declaratory-judgment claim is derivative, so to the extent the other claims lack a reasonable basis, it does too. *See Whitney v. Guys, Inc.,* 700 F.3d 1118, 1121 (8th Cir. 2012).

Phelps responsible for its own conduct: "keep[ing] confidential all nonpublic information" and "not disclos[ing]" anything to "third parties."[4]

Protégé's remaining claims meet a similar fate. Protégé's unlawful-practice-of-law claim fails because, like Smith, Duff & Phelps never gave legal advice. *See Gardner*, 48 N.W.2d at 796. Nor was it a fiduciary, which takes care of both the breach-of-fiduciary-duty and breach-of-principal-agent-duty claims. *See Spinelli*, 903 F.3d at 207; *Meese*, 436 N.Y.S.2d at 499. And we need not consider any other claims because Protégé's brief largely ignores them. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004) (requiring "meaningful argument" to preserve a point on appeal).

IV.

We accordingly affirm the judgment of the district court.

ERICKSON, Circuit Judge, dissenting.

I agree that the terms of Protégé's engagement agreement with Duff & Phelps are straightforward and that New York law governs this dispute. I disagree with the

---

[4]Even if Duff & Phelps was grossly negligent in performing the contract, as Protégé claims, it would make no difference. As New York courts have held, "claims based on negligent or grossly negligent performance of a contract are not cognizable." *City of N.Y. v. 611 W. 152nd St., Inc.*, 710 N.Y.S.2d 36, 38 (N.Y. App. Div. 2000); *see also Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 568 N.Y.S.2d 581, 583 (N.Y. App. Div. 1991) ("[N]egligent performance of the contract[] [is] a cause of action which simply does not exist."). And the allegations in the complaint do not rise to the level of gross negligence anyway, which involve "outrageous acts of folly," not reasonable mistakes of fact. *Hartford Ins. Co. v. Holmes Prot. Grp.*, 673 N.Y.S.2d 132, 133 (N.Y. App. Div. 1998) (noting that conduct "is not gross[ly] negligen[t]" unless it "evince[d] a reckless disregard for the rights of others or smack[ed] of intentional wrongdoing" (quotation marks omitted)).

majority's conclusion that Phil Smith was fraudulently joined, that Protégé has failed to allege a plausible claim for relief against Duff & Phelps, or that the indemnification provision immunizes Duff & Phelps from all potential liability arising in this case.

Duff & Phelps, a multinational consultancy firm based in New York, agreed to do more than merely keep nonpublic information it learned about Protégé's business confidential. It agreed to perform a number of tasks for Protégé in exchange for a nonrefundable transaction fee equal to 3% of the aggregate value of all cash, securities, and other property paid to Protégé in the event of a sale of the business, but in no event less than $700,000. Compl., Ex. B, ¶ 5. Duff & Phelps estimated the sale of Protégé's business could fetch at least $23 million. Relevant to the claims here, Duff & Phelps agreed to contact potential purchasers approved by Protégé and provide the potential purchaser, under a non-disclosure agreement, with confidential information about the business Protégé sought to sell. Compl., Exh. B, ¶ 1(c). Phil Smith (Managing Director of the Healthcare Mergers and Acquisitions Department in the Minneapolis, Minnesota office) signed the agreement on December 1, 2017, on behalf of Duff & Phelps. Id. at p. 6.

Consistent with his obligations under the agreement, Smith undertook the responsibility of getting the signatures for a potential buyer on a non-disclosure agreement, which had been approved by Protégé and its counsel. Like the engagement agreement, Smith signed the non-disclosure agreement for "Project Falcon" (an internal reference for Protégé) on behalf of Duff & Phelps. Compl., Exh. D, p. 5. Doug Schillinger accepted the terms on behalf of DW Healthcare Partners. Id. Curiously, Smith left the line on the non-disclosure agreement marked "Buyer" completely blank. Id. at p. 1. Even though the potential buyer was not identified and the only signatory on the form for the potential buyer was identified as DW Healthcare Partners, Smith's supervisor informed Protégé in writing that they "have a signed non-disclosure agreement in place with DW Healthcare/Zmedica and they would like to have a call." Compl., Exh. F. Given the litigation that has

followed, it is indisputable that Smith/Duff & Phelps' efforts to obtain a non-disclosure agreement with Z-Medica were deficient and Duff & Phelps' representation to Protégé that there was a non-disclosure agreement in place with Z-Medica was inaccurate. In fact, there was a judicial determination, at the motion to dismiss stage, finding Z-Medica was not bound by the non-disclosure agreement Duff & Phelps obtained under the terms of the engagement agreement. See Protégé Biomedical, LLC v. Z-Medica, LLC, 394 F.Supp.3d 924, 937-38 (D. Minn. 2019).

Smith, acting on behalf of Duff & Phelps, signed both the engagement agreement and the non-disclosure agreement at issue. He assumed responsibility for obtaining the non-disclosure agreement with Z-Medica. As a case proceeds, it is not uncommon for an employer to attempt to shift responsibility or advance defenses or positions adverse to its bad-acting or negligent employee. In my experience as a lawyer and judge, it is prudent, not fraudulent, to name as a defendant the employer and the employee whose conduct has been called into question, particularly when the employee is the signatory to the parties' agreements. With no fraudulent joinder of Smith, jurisdiction properly lies in state court.

If federal jurisdiction is proper, I would reverse the dismissal of the breach of contract, negligence, and professional malpractice claims because the complaint is well-pleaded under New York law as to these claims. While the complaint is no model of clarity, Protégé has alleged it was assured prior to its decision to disclose confidential information about its business that there was a non-disclosure agreement with Z-Medica. At the telephone conference arranged by Duff & Phelps, two Z-Medica representatives; Schillinger; and representatives from Duff & Phelps remained silent when Protégé's owner announced that he was willing to discuss confidential business information "[s]ince we're all under an NDA." Protégé has alleged that it would not have disclosed its confidential information but-for Duff & Phelps' representations that there was a non-disclosure agreement with Z-Medica. The majority's acceptance of Duff & Phelps' attempt to escape responsibility on the

ground that it was Protégé, not Duff & Phelps, who disclosed its own confidential information to Z-Medica misses the crux of Protégé's claims.

In the engagement agreement, Duff & Phelps accepted the responsibility of obtaining a non-disclosure agreement that would preserve the confidentiality of Protégé's trade secrets. After this agreement was signed and when Smith thought someone from DW Healthcare Partners had independently reached out to his client Protégé, Smith contacted Schillinger to make sure they had "a clear path forward." Compl., Exh. E, p. 2; see Compl., Exh. D, p. 4. DW Healthcare Partners understood that it would "have to go through Duff and Phelps to learn more" about Protégé. Compl. Exh. E, p. 1.

Once Duff & Phelps undertook the duty to obtain the non-disclosure agreement, Duff & Phelps, as an entity providing professional services, assumed a duty to act with reasonable care and diligence. While the majority makes short work of each of Protégé's claims, New York expressly recognizes that "a legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship and that several types of defendants—including professionals— can be held liable in tort for failure to exercise reasonable care, irrespective of their contractual duties." Dormitory Auth. v. Samson Constr. Co., 94 N.E.3d 456, 460 (N.Y. 2018) (cleaned up). "In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care." Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1369 (N.Y. 1992).

Protégé alleged, as the majority notes, a professional malpractice claim. In a malpractice claim, a defendant is "held to the level of skill and care used by others in the community who practice the same profession." Reis v. Volvo Cars of N. Am., 18 N.E.3d 383, 387 (N.Y. 2014). This standard stands in contrast to a typical negligence claim where a jury "must compare the defendant's conduct to that of a reasonable person under like circumstances." Id. Even though the difference

between these standards might be subtle, it is important to apply the correct standard to the distinct claims. Id. at 388.

While it is undisputed that Protégé's counsel was actively involved in formulating the terms for an acceptable non-disclosure agreement, there is no indication that Duff & Phelps provided the partially completed non-disclosure agreement to Protégé prior to facilitating the meeting that allowed Z-Medica to obtain and steal Protégé's trade secrets. Thus, Protégé could not have decided for itself or with the assistance of counsel whether the non-disclosure agreement bound Z-Medica. The undisputed information in the record before us is that Protégé relied exclusively on the terms of the engagement agreement in conjunction with the express statements, representations, and expertise of Duff & Phelps, and no one else.

I have doubts about whether a reasonable person, let alone a business that holds itself out as having expertise as financial advisors to multimillion dollar transactions, could have reasonably believed that Z-Medica was bound by a confidentiality agreement in which Z-Medica was neither identified nor a signator. Nonetheless, at a minimum, the majority's characterization of the alleged blunders by Duff & Phelps as "reasonable mistakes" necessarily gives rise to questions for the ultimate finder of fact to decide. See Havas v. Victory Paper Stock Co., Inc., 402 N.E.2d 1136, 1139-40 (N.Y. 1980) ("It was particularly appropriate to leave th[e] issue [of negligence] to the jury, not only because of the idiosyncratic nature of most tort cases, or because there was room for a difference in view as to whether [the defendant's] conduct in the particular circumstances of this case did or did not evidence a lack of due care, but, perhaps above all, because, in the determination of issues revolving about the reasonableness of conduct, the values inherent in the jury system are rightfully believed an important instrument in the adjudicative process.")

The court's role at this stage is limited to determining the sufficiency of the allegations, not claim resolution. In exchange for at least $700,000, the engagement agreement on its face obligated Duff & Phelps to do more than, as the majority finds,

personally keep confidential all nonpublic information and not disclose anything to third parties. Moreover, as a policy, separate and distinct from any contractual obligation, New York law requires professionals to exercise reasonable skill and care. The failure to do so can give rise to a tort claim. In my view, Protégé has alleged sufficient facts to satisfy the plausibility standard for its breach of contract, negligence, and professional malpractice claims. Of course, Protégé cannot double-recover for its losses, but New York allows for the pursuit of both types of claims—contract and tort—when there is an independent duty that may exist beyond contractual duties.

The majority references the existence of a broad indemnification agreement, which it finds immunizes Smith from liability. The indemnification provisions consist of 2½ pages attached to the engagement agreement as Schedule A. While the indemnification provisions require Protégé to indemnify Duff & Phelps for nearly all imaginable claims or losses related to its services, it does not definitely absolve Duff & Phelps from all potential liability under the undisputed facts of this case. The provisions provide:

> A. Indemnification. To the fullest extent lawful, the Company will promptly, upon demand, indemnify and hold harmless Duff & Phelps Securities, LLC and their affiliates (collectively, "D&P"), and each director, officer, employee, agent, member and controlling person of D&P (any or all of the foregoing hereinafter referred to as an "Indemnified Person"), from and against all losses, claims, damages, expenses (including reasonable fees and disbursements of counsel and accountants), costs (including, without limitation, expenses, fees and disbursement and time charges related to giving testimony or furnishing documents in response to a subpoena or otherwise) and liabilities (joint or several), (collectively, "Losses"), resulting directly or indirectly from any threatened or pending investigation, action, claim, proceeding or dispute, including securityholder actions (whether or not D&P or any other Indemnified Person is a potential or actual named party or witness) (collectively, a "Claim"), which (1) are related to or arise out of any untrue statement or alleged untrue statement of a material fact

contained in any oral or written information provided to D&P or any other person by the Company or used by the Company in connection with the transaction contemplated by the engagement letter or any omission or alleged omission by the Company to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (2) are otherwise related to or arise out of D&P's engagement, role, activities or the performance or nonperformance of professional services on the Company's behalf. The Company will not be responsible, however, for any Losses pursuant to clause (2) of the preceding sentence which are judicially determined to have resulted primarily and directly from the willful misconduct or gross negligence of any Indemnified Person seeking indemnification hereunder or related to a breach by D&P of this Agreement; but pending any such judicial determination, the indemnification and reimbursement obligations of the Company hereunder shall continue to apply. **The Company also agrees that neither D&P nor any Indemnified Person shall have any liability to the Company, its owners, parents, creditors or securityholders for or in connection with its engagement, except such liability for Losses incurred by the Company which are judicially determined to have resulted primarily and directly from D&P's or such Indemnified Person's willful misconduct or gross negligence or related to a breach by D&P of this Agreement.** For purposes of the foregoing, "judicially determined" shall mean determined by a court of competent jurisdiction.

Compl., Exh. B, p. 7 (emphasis added). The narrow areas excepted involve willful misconduct, gross negligence, and breach of contract by Duff & Phelps.

New York has a public policy rule that prohibits parties from insulating themselves from damages caused by grossly negligent conduct. Matter of Part 60 Put-Back Litig., 165 N.E.3d 180, 184, 186 (N.Y. 2020). Parties are allowed, however, to contractually limit remedies that do not immunize the breaching party from all liability for its conduct. Id. In other words, "a total immunity clause is bad; a limitation provision, if reasonable, is not." Id. at 187 (cleaned up).

-11-

This is so because public policy will not permit a party who engages "in conduct that smacks of intentional wrongdoing or evinces reckless disregard for the rights of others . . . to escape all liability for its misconduct." Id. at 188. "[B]ecause the law looks with disfavor upon agreements intended to absolve a party from the consequences of its wrongdoing, a release which purports to excuse a party from responsibility from misconduct is subject to the closest of judicial scrutiny." Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 515 (2d Cir. 2001) (analyzing New York law) (cleaned up).

I recognize that competing against this policy is another public policy—the freedom of contract. Id. Under New York law, "[w]hen the clause limiting liability is negotiated at arm's length by sophisticated parties, provides for more than nominal damages, and does not wholly exculpate the breaching party, the rationales underlying the gross negligence public policy exception fail to overcome the public policy in favor of freedom of contract" when "the only causes of action raised in the complaint sound in breach of contract." Id.

As noted earlier, I believe Protégé has sufficiently pleaded causes of action for not only breach of contract but also negligence and professional malpractice. Whether it was Duff & Phelps' conduct that caused Protégé to unwittingly disclose its confidential business information to an entity not bound by a confidentiality agreement amounts to gross negligence, ordinary negligence, reckless indifference, or no claim at all is for the fact finder to determine. See Sommer, 593 N.E.2d at 1371 ("Whether this indeed is a case of simple mistake or reckless indifference is for a jury to determine."); Internationale Nederlanden (U.S.) Cap. Corp. v. Bankders Tr. Co., 689 N.Y.S.2d 455, 460 (N.Y. App. Div. 1999) (quoting Food Pageant, Inc. v. Consol. Edison Co., 429 N.E.2d 738, 740 (N.Y. 1981)) ("Where the inquiry is to the existence or nonexistence of gross negligence, the ultimate standard of care is different [from ordinary negligence], but the question nevertheless remains a matter for jury determination.").

For these reasons, I would reverse the dismissal of the breach of contract, negligence, and professional malpractice claims.

_____